851 So.2d 1230 (2003)
Cleo P. PELLETERI
v.
The CASPIAN GROUP INCORPORATED.
The Caspian Group, Inc.
v.
Cleo P. Pelleteri.
Nos. 2002-CA-2141, 2002-CA-2142.
Court of Appeal of Louisiana, Fourth Circuit.
July 2, 2003.
*1232 Burt K. Carnahan, Candace M. Murphy, Lobman, Carnahan, Batt, Angelle & Nader, New Orleans, LA, for Cleo P. Pelleteri.
Jack A. Ricci, Gary J. Giepert, Ricci & Giepert, New Orleans, LA, for The Caspian Group, Incorporated.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
This is an appeal by both parties from a judgment awarding damages to The Caspian Group, Incorporated ("Caspian")[1] in connection with its eviction from the premises where it operated a restaurant and bar. For the reasons set forth below, this Court affirms the judgment of the trial court on the issue of liability but reverses the judgment of the trial court on the issue of damages.

FACTS AND PROCEDURAL HISTORY
Cleo Pelleteri leased the premises at 437 Esplanade Avenue in New Orleans, Louisiana (the "Leased Premises") to Caspian pursuant to a Lease of Commercial Property dated September 30, 1996 (the "Lease"). The initial term of the Lease was three years. The Lease also provided for two renewal terms of three years each. The rent due under the Lease beginning December 1, 1996, was $3,500 per month plus a percentage rental in the amount of six percent of gross sales in excess of $650,000.00 per year.
In October and November of 1996, Caspian prepared the Leased Premises for the operation of a restaurant and bar, obtained permits and licenses needed for its business, hired employees, and began making arrangements for the installation of three video poker machines in the bar. At the end of November, 1996, Caspian opened the Half Moon Bar and Grill (the "Half Moon") in the Leased Premises.
On March 13, 1997, Ms. Pelleteri inspected the Leased Premises and subsequently wrote a letter to Haluk Dogru, Caspian's president, listing several items that she considered to be violations of the Lease. She stated in that letter that she would make another inspection of the premises within fifteen days. After the follow-up inspection, Ms. Pelleteri wrote another letter to Mr. Dogru asking that Caspian "vacate my property immediately". Ms. Pelleteri wrote a third letter to Mr. Dogru confirming "your default of the lease". There was no allegation by Ms. Pelleteri of nonpayment of rent.
On Friday, April 18, 1997, Ms. Pelleteri spoke with Mr. Dogru by telephone and advised him that she was going to put a lock on the door of the Half Moon on Monday, April 21, 1997. After the Half Moon closed at 4:00 a.m. that Monday morning, out of concern that Ms. Pelleteri might actually lock them out of the Half Moon, Caspian removed most of the food and liquor from the Leased Premises when the Half Moon closed in the early morning hours on Monday, April 21. Caspian did not remove the computer used in operating the Half Moon, because it was difficult to move and would be needed if the Half Moon opened later that day. Caspian also left its business records in the Leased Premises. Additionally, Caspian asked its employees to come to work on Monday, April 21, to prepare to open the Half Moon as usual that afternoon. When the employees arrived at the Leased Premises to prepare to open the Half Moon later in *1233 the day, they found that the Leased Premises had been padlocked. Ms. Pelleteri subsequently had all the locks in the Leased Premises changed.
Because the next weekend was the first weekend of the annual New Orleans Jazz and Heritage Festival (the "Jazz Fest"), Caspian had published advertisements targeted at the Jazz Fest crowds and had hired a band to perform on the weekends of the Jazz Fest. Ms. Pelleteri testified that when Mr. Dogru, Caspian's president, requested that the Half Moon be allowed to remain open at least through the end of the Jazz Fest, she replied, "Absolutely not."
In a letter dated June 19, 1997, Ms. Pelleteri gave Caspian a five day notice to vacate the Leased Premises, and on July 17, 1997, Ms. Pelleteri filed a Petition for Eviction in the Civil District Court for the Parish of Orleans. Caspian's attorney advised Ms. Pelleteri's attorney that Caspian would not contest the eviction, because Caspian could no longer afford to rent the Leased Premises due to the action taken by Ms. Pelleteri. A Judgment of Eviction was rendered on July 25, 1997.
On July 31, 1997, Caspian filed suit against Ms. Pelleteri for, among other things, the damages resulting from the wrongful eviction. On August 12, the eviction suit filed by Ms. Pelleteri and the suit filed by Caspian against Ms. Pelleteri were consolidated.[2] On October 3, 1997, Ms. Pelleteri filed an answer to the lawsuit filed by Caspian. Ms. Pelleteri also filed a reconventional demand with her answer, in which she sought damages in connection with what she alleged were defaults under the Lease. She also alleged that Caspian had abandoned the Leased Premises. Therefore, she asserted that she was entitled to reenter the Leased Premises when she did without obtaining a judgment of eviction.
A trial was held on January 24, 25, and 26, 2001. At trial two of Caspian's shareholders, Mr. Dogru and Mr. Hassan Khaleghi, testified that they had extensive experience in the restaurant business. A third shareholder, Mr. Yalcin Hatipoglu, who, along with Mr. Khaleghi, ran the day to day operations of the Half Moon, testified that he had experience managing and owning restaurants. There was also testimony that although the Half Moon lost money the first three months it was open, it broke even in March of 1997, and it was profitable in April of 1997, even though it was only open for business for part of that month. Mr. Hatipoglu testified that although he was disappointed in the Half Moon's business initially, once the opening and closing hours and the menu were changed to attract more of the late night crowd, business dramatically improved.
Ms. Pelleteri testified at trial that when she went to the Leased Premises on Monday, April 21, 1997, the premises had been abandoned. Ms. Pelleteri further testified that she looked through a window of the Leased Premises and "the bar had been totally emptied of liquor bottles and certainly appeared that people had indeed left."
Also at trial Ms. Pelleteri testified regarding Caspian's alleged defaults under the Lease, which were discovered by Ms. Pelleteri in her March 13, 1997 inspection of the Leased Premises. Her letter itemized the following deficiencies:
1. the bathrooms and the floor around the bar were filthy;
2. faucets leaked and fans were "beyond filthy";

*1234 3. the patio, which had been "lush and inviting with herbs and foliage" prior to Caspian's occupancy of the Leased Premises, resembled a "site sprayed with `agent orange'";
4. the walls were defaced;
5. there was scorching in the kitchen;
6. sections of the ceiling tiles were missing; and
7. an electric convection oven was "out in the weather".
Mr. Dogru testified at trial regarding each of these alleged defaults under the Lease. He testified that he did "not really" find the bathrooms or the floor around the bar to be "filthy", that the faucets did not leak, and that the fans were not "beyond filthy". With respect to the patio resembling a site sprayed with agent orange, Mr. Dogru stated that the patio was "not destroyed, it's cleaned up." He further stated that the walls were not defaced and that there was no scorching of the kitchen walls. There were no ceiling tiles missing, and the convection oven Ms. Pelleteri allegedly found in the rain was actually a warmer, not a convection oven.
Mr. Khaleghi testified regarding the alleged defaults under the Lease. He testified that the bathrooms and floor around the bar were not filthy, as alleged by Ms. Pelleteri, and that the patio had so many shrubs that they had to cut some and that they had to remove the dead banana trees that had been killed by a freeze. With respect to defacing the walls, Mr. Khaleghi testified that "we did a little painting in the dinning [sic] room for one reason and one reason only, we wanted to make money out of that place and we thought face lifting would be sufficient for that purpose." When he was questioned about the scorching in the kitchen and the missing ceiling tiles, Mr. Khaleghi admitted that they were moving ceiling tiles so that lights could be installed over the pool table. He stated further that the ceiling tiles were removable and that the ceiling was in no way damaged by installing the lighting. Finally, Mr. Khaleghi testified that the electric convection oven that Ms. Pelleteri alleged was outside was not a convection oven. He said that it was a food warmer consisting of a metal container on wheels and that it was taken outside for cleaning but was not exposed to the weather.
After the trial the judge rendered a Judgment on July 12, 2001, in which she awarded Caspian $249,800. Ms. Pelleteri filed a motion for a new trial, and the motion was heard on May 24, 2002. On July 26, 2002[3], the trial court rendered a Judgment granting the motion for a new trial and reducing the amount awarded to Caspian in the original judgment to $14,193.39. Ms. Pelleteri and Caspian are both appealing the July 26, 2001 Judgment. Caspian is also seeking an award of attorneys fees and expert witness fees.

STANDARD OF REVIEW
In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court discussed as follows the issue of the scope of the appellate court's review of a trial court's findings of fact:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court *1235 may feel that its own evaluations and inferences are as reasonable.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
Id. at 844. See also Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073; Aleman v. Favret Co., 349 So.2d 262 (La.1977); Harvey v. Cole, XXXX-XXXX (La.App. 4 Cir. 1/23/02), 808 So.2d 771.
With respect to issues of law, however, this Court is required to determine whether the trial court applied the law appropriately. In Glass v. Alton Ochsner Medical Foundation, XXXX-XXXX (La.App. 4 Cir. 11/6/02), 832 So.2d 403, this Court discussed the scope of appellate review of issues of law as follows:
The standard of review of appellate courts in reviewing a question of law is simply whether the court's interpretative decision is legally correct. Phoenix Assur. Co. v. Shell Oil Co., 611 So.2d 709, 712 (La.App. 4 Cir.1992). Furthermore, if the decision of the district court is based on an erroneous application of law rather than on a valid exercise of discretion, the decision is not entitled to deference by the reviewing court. Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1071-1072 (La.1983).
XXXX-XXXX, p. 3, 832 So.2d at 405. See also Sander v. Brousseau, XXXX-XXXX, p. 4 (La. App. 4 Cir. 10/4/00), 772 So.2d 709, 711, where this Court stated that "[a]ppellate review of a question of law involves a determination of whether the lower court's interpretive decision is legally correct."

DISCUSSION

LIABILITY

Legal Prohibition Against Self-Help
Louisiana Civil Code article 2692 lists the obligations of the lessor that arise from a lease contract. That article provides, in relevant part, that "[t]he lessor is bound from the very nature of the contract, and without any clause to that effect... [t]o cause the lessee to be in a peaceable possession of the thing during the continuance of the lease."
Louisiana Code of Civil Procedure article 4701[4] provides, in relevant part, as follows:
When a lessee's right of occupancy has ceased because of the termination of the lease by the expiration of its term, action by the lessor, nonpayment of rent, or for any other reason, and the lessor wishes to obtain possession of the premises, the lessor or his agent shall cause written notice to vacate the premises to be delivered to the lessee.
Louisiana Code of Civil Procedure article 4731(A) provides in relevant part:
If the lessee ... fails to comply with the notice to vacate required under this Title ... and has lost his right of occupancy for any reason, the lessor or owner... may cause the lessee ... to be cited summarily by a court of competent jurisdiction to show cause why he should not be ordered to deliver possession of the premises to the lessor or owner.
*1236 The jurisprudence has made it clear that a lessor must use judicial process to evict a lessee from the leased premises in the event of a default under a lease. In Boniel v. Block, 44 La. Ann. 514, 10 So. 869 (1892), the Louisiana Supreme Court articulated the rule against allowing a lessor to regain possession of premises that have been leased through the use of self-help, as follows:
Counsel for defendant has quoted some common-law authorities which are no doubt of great weight in the cases to which they apply; but, so far as this case is concerned, we prefer to rest it upon the memorable case of Thayer v. Littlejohn, (decided by this court,) 1 Rob. (La.) 140, in which the doctrine, ever since followed by this court, was laid down, that, `where a landlord, instead of resorting to the means provided by law for obtaining payment of his rent and possession of his premises, takes upon himself, without authority, to remove the property and turn out the family of his tenant, he will be liable in damages ....'

44 La. Ann. at 516-17, 10 So. at 870 (emphasis added).
In Weber v. McMillan, 285 So.2d 349 (La.Ct.App. 4th Cir.1973), this Court recognized the long standing rule enunciated in the Boniel case as follows:
It has long been established in our law that a lessor has no right to take possession or in any way disturb the possession of the lessee without first resorting to judicial process. If the lessor should wrongfully dispossess the lessee, he commits a trespass and becomes liable to the lessee in damages.
Id. at 351. See also, e.g., Richard v. Broussard, 495 So.2d 1291 (La.1986); Connecticut General Life Insurance Co. v. Melville Realty Co., 591 So.2d 1376 (La.Ct. App. 4th Cir.1991); Gennings v. Newton, 567 So.2d 637 (La.Ct.App. 4th Cir.1990); Fo-Coin Co. v. Drury, 349 So.2d 382 (La. Ct.App. 4th Cir.1977).
The first issue that must be addressed by this Court in the instant case is whether or not Ms. Pelleteri is liable for wrongfully evicting Caspian. In her original reasons for judgment, dated July 12, 2001, the trial court stated as follows:
The testimony revealed that defendant Cleo Pelleteri demanded that the plaintiffs leave the premises and went in the next day to padlock them, employing self help techniques contrary to law. Plaintiffs were not behind in rent, nor had they been placed in default based on any provision of the lease. She then sought to legitimize the wrongful eviction by instituting eviction proceedings three months after she had already taken possession of the premises.
In her reasons for judgment, dated July 26, 2002, which were rendered after the new trial that was granted to Ms. Pelleteri, the trial court stated the facts in the instant case as follows:
Ms. Pelleteri leased her business to The Caspian Group. A few months into the lease period, she became displeased with the cosmetic changes made by the lessees. She called them and ordered that they vacate the premises immediately. Ms. Pelleteri further threatened to padlock the building. Fearing the loss of their contents, The Caspian Group attempted to remove as much as possible. As promised, Ms. Pelleteri padlocked the premises on the following day (There was no issue of nonpayment of rent.).
The trial court then stated that Ms. Pelleteri's actions "constituted a wrongful eviction."
This Court has reviewed the record in the instant case and finds that there was no manifest error or abuse of discretion in the trial court's finding of fact as set forth *1237 in the quoted portions of the reasons for judgment in both the original trial and in the new trial. In fact, this Court agrees with the trial court's findings of fact.

Abandonment Exception
Louisiana Code of Civil Procedure article 4731(B) provides that "[a]fter the required notice has been given, the lessor or owner ... may lawfully take possession of the premises without further judicial process, upon a reasonable belief that the lessee ... has abandoned the premises." This is an exception to the rule against the use of self-help in the eviction process, and it has been recognized by the jurisprudence.
In Richard v. Broussard, 495 So.2d 1291 (La.1986), the Louisiana Supreme Court addressed the exception to the self-help prohibition as follows:
[W]hen the lessee breaches the lease by abandoning the premises, the lessor has the right to take possession of the premises as agent for the lessee and to relet the premises to a third party without canceling the lease or relieving the lessee of his obligations under the lease contract.
Id. at 1293 (footnote omitted).
In Connecticut General Life Insurance Co. v. Melville Realty Co., 591 So.2d 1376 (La.Ct.App. 4th Cir.1991), this Court addressed the abandonment exception as follows:
The third option [to enter the leased premises to relet them in the case of an unjustifiable abandonment] is an exception to the general rule that a lessor may not take possession or in any way disturb the possession of the lessee without first resorting to judicial process. It allows the lessor to exercise self-help when the lessee has voluntarily abandoned the premises. La. C.C.P. article 4731. See Bunel of New Orleans, Inc. v. Cigali, 348 So.2d 993 (La.App. 4th Cir.1977), writ denied 350 So.2d 1210 (La.1977). The way in which this self-help remedy operates is the lessor has the right to reenter the premises for the purpose of reletting the property to a third person, with the lessee receiving the benefit of any rent collected from the third person (after recovery by the lessors of costs, fees and expenses of collection, and the expense of redecorating or altering the premises) but remaining liable for their obligations under the lease.
Id. at 1378.
Ms. Pelleteri's actions in padlocking Caspian out of the Leased Premises clearly constituted a wrongful eviction, and she is liable in damages to Caspian. Her argument that Caspian abandoned the Leased Premises, thereby entitling her to retake possession of the Leased Premises without judicial process, is without merit. The trial court found that Caspian's hurried removal of food and liquor from the Leased Premises occurred, because Caspian feared the loss of these items if Ms. Pelleteri followed through on her threat to lock Caspian out of the Leased Premises. This Court agrees with the trial court that Caspian did not abandon the Leased Premises based on the facts presented at trial.

Effect of a Judgment of Eviction after Wrongful Eviction
The trial court's reliance on Montz v. Theard[5], XXXX-XXXX (La.App. 1 Cir. 2/27/02), 818 So.2d 181, in determining that the Judgment of Eviction established a date after which Ms. Pelleteri's liability for her wrongful eviction of Caspian ceased, was misplaced. This Court finds that the *1238 Montz case is inapplicable to the instant case. In the Montz case, unlike in the instant case, the eviction was not found to be a wrongful eviction. There was a judgment of eviction that resulted from a contested judicial proceeding, and the party in possession of the premises in the Montz case remained in those premises until the judicial proceedings were final. Additionally, the contract in the Montz case was not a lease. The Louisiana First Circuit Court of Appeal considered whether the contract was a type of conditional sale, bond for deed, or innominate contract before deciding that it was unnecessary to determine exactly what type of contract was involved. The Court never considered the contract to be a contract of lease.
There was testimony at trial that the Caspian shareholders were puzzled when they received the notice to vacate the Leased Premises in connection with the eviction proceeding filed by Ms. Pelleteri. They wondered why they were being notified to vacate the Leased Premises when they had not been permitted to occupy the Leased Premises since they were wrongfully evicted. At trial there was testimony that by the time the eviction proceedings were filed, the Caspian shareholders could not afford to resume their restaurant and bar business in the Leased Premises. They would have to incur additional start-up costs, because the business had been closed, and Caspian could not afford this new expense. Therefore, there was no reason for Caspian to try to regain the right to occupy the Leased Premises.
In the instant case the eviction of Caspian from the Leased Premises occurred when Ms. Pelleteri padlocked the Leased Premises. The Judgment of Eviction obtained by Ms. Pelleteri did not in any way sanction the wrongful eviction, and it did not, in fact, evict Caspian from the Leased Premises. Caspian had already been evicted from the Leased Premises. The Judgment of Eviction merely returned lawful possession of the Leased Premises to Ms. Pelleteri so that she could either occupy the Leased Premises herself or relet them.

Finding of Wrongful Eviction
Based on the foregoing discussion, this Court finds that Ms. Pelleteri wrongfully evicted Caspian from the Leased Premises. Caspian did not unjustifiably abandon the Leased Premises, so Ms. Pelleteri was not authorized to retake the premises without judicial process. Additionally, when the Judgment of Eviction was rendered, Caspian had already been wrongfully evicted from the Leased Premises. Therefore, the Judgment of Eviction had no effect on the liability Ms. Pelleteri incurred as a result of her wrongful eviction of Caspian.

DAMAGES
Louisiana Civil Code article 2696 provides that "[i]f the lessee be evicted, the lessor is answerable for the damage and loss which he sustained by the interruption of the lease." Louisiana Civil Code article 1995 provides that the measure of damages for an obligor's failure to perform a contract is "the loss sustained by the obligee and the profit of which he has been deprived." Louisiana Civil Code article 1999 provides that "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." Article 1999 applies to damages from a breach of a contractual obligation. La. C.C. art. 2324.1, which applies to tort liability, also provides that "[i]n the assessment of damages ... much discretion must be left to the judge or jury."
In Waller & Edmonds v. Cockfield, 111 La. 595, 35 So. 778 (1904), a wrongful eviction case, the Louisiana Supreme Court stated as follows regarding the damages that could be recovered by the lessee in that case:

*1239 This brings us to a consideration of the amount of damages. The ouster resorted to by defendant was illegal, and it was made in such positive terms that plaintiffs could not do less than, as they did, leave and abandon their rights as lessees.
From this point of view they are entitled to judgment for amounts which they would have earned, as made to appear by the testimony, if they had been allowed to continue in their work of running the gin.
...
Manifestly, plaintiffs sustained a loss. Defendant is liable for an illegal act; in other words, a tort or wrong, which is the proximate cause of the loss.
...
We come to exemplary damages-a question which presents some difficulty in deciding. The liability is partly contractual and partly ex delicto. To the extent that it is ex delicto, plaintiffs may recover.
111 La. at 600-01, 35 So. at 780. See also Chronister v. Creole Corporation, 147 So.2d 218 (La.Ct.App. 4th Cir.1962), also a wrongful eviction case, where this Court stated that the Waller & Edmonds case "is authority for the preposition [sic] that the violation of a contract can cause damages ex delicto as well as contractual in a breach of a contract." Id. at 220.
In Fo-Coin Co. v. Drury, 349 So.2d 382 (La.Ct.App. 4th Cir.1977), this Court reiterated that damages from wrongful eviction are not only contractual but also are delictual. This Court stated that "[w]hen a lessor takes the law in his hands by unlawfully dispossessing a tenant, he commits a trespass and is liable for general damages." Id. at 384.
In New Orleans Riverwalk Associates v. Robert P. Guastella Equities, Inc., 94-2092, 94-2093 (La.App. 4 Cir. 11/16/95), 664 So.2d 151, this Court discussed damages in the context of a wrongful eviction case. This Court stated that "[w]hen damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. The reviewing court must evaluate the particular injuries and their effects on the particular injured persons." 94-2092, 94-2093, p. 9, 664 So.2d at 157 (citations omitted).
The trial court initially assessed damages against Ms. Pelleteri in the amount of $249,800. This amount, as stated in the trial court's reasons for judgment, was based solely on revenues derived from video poker. The trial court stated in her reasons for judgment, dated July 12, 2001, that the revenues from video poker "averaged $27,700 per machine, per year." After the new trial that was granted to Ms. Pelleteri, the trial court again rendered judgment against Ms. Pelleteri but reduced the amount of damages assessed against her. In her Judgment, dated July 26, 2002, the trial court awarded Caspian $14, 193.39. In her reasons for judgment, dated the same date, the trial court stated that the award was based on the projected revenues that Caspian would have earned during the three month time period from the date the Leased Premises were padlocked until the Judgment of Eviction was rendered on July 25, 1997. The trial court found that the only revenue reasonably certain to have been earned during this time period would have been from video poker machines, and the net revenue from those machines was calculated to be $14,193.38 for that time period.
At trial expert witnesses for both sides testified regarding the damages suffered by Caspian. The two methods that Caspian's expert determined to be most useful in assessing the lost profits from the Half Moon were the "yardstick method" and the "hypothetical revenue and profit method." The expert used the budget prepared by *1240 one of Caspian's shareholders in assessing lost profits using the "hypothetical revenue and profit method". Caspian's expert used another restaurant he deemed comparable to the Half Moon and a bar with video poker machines at a location less than a block from the Leased Premises as "yardsticks" from which he could extrapolate the potential lost profits suffered by Caspian from the wrongful eviction. At trial Caspian's expert testified that using the "yardstick method", he determined that in the initial lease term that the lost profits were greater than $480,000. There was also testimony at trial that Caspian lost approximately $35, 000 in start up costs and liquor worth about $1,000. Part of the start up costs included the cost of a computer that Caspian's shareholders were still able to use later, so the cost of the computer would not be an item of damages.
The expert witness who testified at trial on behalf of Ms. Pelleteri was qualified in the fields of business administration and economics. Ms. Pelleteri's expert was asked by the trial court, "Did you come up with an overall conclusion about any damages that these people may have suffered?" The expert then stated, "In fact I went one step beyond, I said not only weren't there any damges [sic], but the closure for whatever reason prevented multiplying the losses, and averted further loses [sic]." Although Ms. Pelleteri's expert disagreed with the analysis of future profits used by Caspian's expert, he did say that "[t]he format, the general approach, the yardstick approach, that is fine." Ms. Pelleteri's expert used data available from the National Restaurant Association in reaching this conclusion.
This Court has carefully reviewed the expert witness testimony in the instant case and does not think that the damage assessment by either expert is sufficiently nonspeculative for this Court to determine the potential lost profits that might have resulted from the wrongful eviction. At the time of the eviction there were no video poker machines in the Leased Premises, and insufficient evidence was presented at trial for this Court to conclude that the necessary applications and licenses required for the video poker machines would be forthcoming. Additionally, the restaurant Caspian's expert used as a "yardstick" for his calculation of lost profits was not located near the Leased Premises, was a different type of restaurant, and served a completely different type of clientele than did the Half Moon.
Although this Court considered the measure of damages in wrongful eviction cases involving business enterprises in New Orleans Riverwalk Associates v. Robert P. Guastella Equities, Inc., 94-2092, 94-2093 (La.App. 4 Cir. 11/16/95), 664 So.2d 151, and in Weber v. McMillan, 285 So.2d 349 (La.Ct.App. 4th Cir.1973), this Court does not find that these cases are instructive in the calculation of damages in the instant case. In the New Orleans Riverwalk case, the lessor's, not the lessee's, profit projection was used to calculate the measure of damages. The profit projection was made at the time of the lease and was a reasonable estimate of what the lessor expected the lessee's profits to be. In the Weber case, unlike the instant case, there was a business history from which future profits could be reasonably determined.
This Court does not, however, find that there were no damages incurred by Caspian. As mentioned above, Caspian incurred start up costs of approximately $35,000 in connection with preparing to open the Half Moon, it was wrongly denied the opportunity to determine whether the Half Moon would become a thriving business enterprise, it suffered the loss of the efforts it had expended in preparing the Half Moon to become profitable. The Half Moon was precipitously closed prior to the Jazz Fest, *1241 a particularly lucrative period for restaurants and bars in New Orleans.
Caspian's shareholders also were forced to start other endeavors when they were wrongfully deprived of possession of the Leased Premises, and such endeavors required new expenditures to be made. Additionally, the Caspian shareholders had substantial experience in the restaurant and bar business, and the abrupt closing of the Half Moon, no doubt, adversely affected their reputation in the restaurant business.
Because the damages in the instant case are "insusceptible of precise measurement", this Court has "much discretion" in assessing the amount of damages. It "shall be left to the court for the reasonable assessment of these damages." La. C.C. arts. 2324.1, 2692. Based on a thorough review of the record, this Court awards Caspian damages resulting from Ms. Pelleteri's wrongful eviction in the amount of $100,000.
AWARD OF FEES FOR ATTORNEYS AND EXPERT WITNESSES

Attorneys Fees
Caspian argues that the trial court improperly failed to award damages for the fees of its expert witness and its attorneys. This Court finds that there should have been an award for the fee of Caspian's expert witness but not for the fees of its attorneys.
Caspian argues that it is entitled to an award of attorney's fees, because Ms. Pelleteri violated the Unfair Trade Practices and Consumer Protection Law (the "Unfair Trade Practices Law"), La. R.S. 51:1401 et seq., which provides for an award for reasonable attorney's fees and costs. The Unfair Trade Practices Law does not specifically define unfair trade practices, and what constitutes an unfair trade practice is determined on a case by case basis. Jefferson v. Chevron, 97-2436, 98-0254 (La.App. 4 Cir. 5/20/98), 713 So.2d 785. Based on the facts in the instant case, this Court does not find that Ms. Pelleteri's actions constitute an unfair trade practice. Therefore, Caspian is not entitled to an award of attorney's fees.

Expert Witness Fees
La. R.S. 13:3666(A) provides for the compensation of expert witnesses. That statute reads as follows:
Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
Additionally, "[t]he court shall determine the amount of the fees of said expert witnesses which are to be taxed to be paid by the party cast in judgment...." La.R.S. 13:3666(B). See also La.C.C.P. art.1920, which provides that "[u]nless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause."
Pursuant to La. R.S. 13:3666(A) Caspian, as the prevailing party in this litigation, is entitled to an award of expert witness' fees. The trial court is given considerable discretion is setting the fees of expert witnesses, and an appellate court will not retract an award absent a showing of a serious abuse of discretion. Mossy Motors v. Water Board of the City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 9/19/01), 797 So.2d 133. Because the trial court is able to hear evidence regarding the expert witness fees and this Court is not, the trial court is the appropriate place for a determination of the amount of those fees that should be assessed against the party cast in judgment.
*1242 In the instant case Caspian filed a Rule to Tax Cost and Attorneys Fees in the trial court. That rule is still pending. In Crosby v. The Great Atlantic & Pacific Tea Co., 408 So.2d 11 (La.Ct.App. 4th Cir. 1982), this Court held that "[t]his court cannot hear evidence regarding costs." Therefore, we refer to the trial court for a hearing on the issue of the assessment of expert witness fees as costs.

CONCLUSION
The judgment of the trial court regarding Ms. Pelleteri's liability for the wrongful eviction of Caspian is affirmed. However, for the reasons set forth in this opinion, the amount of damages awarded to Caspian by the trial court is increased from $14,193.39 to $100,000. This case is further remanded to the trial court solely for the purpose of a hearing on the pending rule to tax costs in accordance with this opinion. The costs of this appeal are assessed against Ms. Pelleteri.
AFFIRMED IN PART, AMENDED IN PART, AND REMANDED FOR CONSIDERATION OF COSTS.
NOTES
[1] Caspian's shareholders included Haluk Dogru, Recep Ozel, Hassan Khaleghi, and Yalcin Hatipoglu. Mr. Khaleghi and Mr. Hatipoglu ran the day to day operations of the restaurant and bar located at 437 Esplanade Avenue.
[2] The eviction suit filed by Ms. Pelleteri was concluded by a Judgment of Eviction rendered on July 25, 1997. Nevertheless, this concluded matter was consolidated with the suit filed by Caspian on July 31, 1997.
[3] The Judgment rendered in connection with the new trail is dated July 26, 2001, but the date should have been July 26, 2002.
[4] See also La. C.C. art. 2713, which establishes a procedure for notice and eviction when the rent is not paid.
[5] This case is cited by the trial court as Montz v. Pilcher. The defendants are Mary D. Pilcher, wife/of and Nevil L. Theard.