JOY COSSICH LOBRANO, Judge.
| defendant, Maison Orleans I, L.L.C. (“MOI”) and the Louisiana Patient’s Compensation Fund (“PCF”), appeal the trial court judgment of May, 11, 2011 [1], finding MOI liable for damages on a claim for the *1016 survival and wrongful death of Helen D’Antoni filed by her surviving children, Linda D’Antoni Hendrix, Elaine D’Antoni Heffker and Deborah D’Antoni Dow[2]. The children of Ms. D’Antoni’s deceased son were also named as plaintiffs in the original petition, but were dismissed from the case during trial. MOI and the PCF filed a joint motion for appeal, noting that under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41 et seq., MOI, as a qualified health care provider, is liable for any judgment amount up to $100,000.00, plus interest, and the PCF is liable for any amount due from a judgment in excess of MOI’s total liability up to the monetary limit provided for in La. R.S. 40:1299.42.
12Helen D’Antoni was admitted as a resident/patient to MOI (a nursing home/ skilled nursing facility) in July 2000, suffering from numerous health problems, including Alzheimer’s disease. In early October 2002, Ms. D’Antoni was admitted to Chalmette Medical Center. Although the parties dispute the primary reason for her admission, the record shows that Ms. D’Antoni was treated for, among other conditions, dehydration, kidney dysfunction and urinary tract infection. The health issues that required Ms. D’Antoni to be hospitalized were resolved with treatment in the hospital, and she returned to MOI after a couple of weeks.
On October 23, 2002, Ms. D’Antoni was certified for hospice care by her treating physician, Dr. Paul Verrette[3], and by the medical director of Hospice of the Delta (“Hospice”), Dr. Christie Graves. Linda D’Antoni Hendrix, Helen D’Antoni’s daughter and primary caregiver, signed numerous forms for her mother to be certified for hospice care, which was to be administered by Hospice at MOI, with MOI also continuing to provide custodial care. In certifying Ms. D’Antoni for hospice care, Drs. Verrette and Graves signed a form stating that given Ms. D’Antoni’s medical condition, she had a life expectancy of six months or less at the time of the certification. It is undisputed that MOI had no role in the certification of Ms. D’Antoni for hospice care.
On March 10, 2003, Ms. Antoni was able to swallow and drink fluids. On March 17, 2003, she was able to feed herself fluids. On March 23, 2003, a MOI |snurse noticed that Ms. D’Antoni was very lethargic and was pocketing food in her mouth. MOI did not notify Ms. D’Antoni’s family, physician or Hospice of the changes in Ms. D’Antoni’s health status on that date. On the morning of March 24, 2003, Ms. D’An-toni would not open her mouth to receive food, liquids or medication. At that time, MOI notified Linda Hendrix and a Hospice nurse of this change in Ms. D’Antoni’s condition. Later that same morning, MOI contacted Dr. Verrette to inform him of the same. Dr. Verrette did not order any changes to be made at that time regarding the care of Ms. D’Antoni.
On March 25, 2003, Linda Hendrix revoked her mother’s status as a hospice patient and admitted her mother to Chal-mette Medical Center. Plaintiffs contend that at the time of admission, Ms. D’Antoni was suffering from extreme weight loss, dehydration, and a decubitus ulcer “big enough to put a man’s fist in,” which conditions were allegedly caused by the breach of the standard of care owed by MOI and Hospice to Ms. D’Antoni. MOI and Hospice contend that weight loss and dehydration were normal expected consequences *1017 for an 89-year-old end-stage Alzheimer’s patient who had been admitted to hospice care. Once admitted to the hospital, Ms. D’Antoni was rehydrated and curative efforts were pursued. Despite these efforts, Ms. D’Antoni passed away three weeks later in the hospital on April 16, 2003.
Plaintiffs filed a lawsuit against MOI and Hospice, alleging violations of the Louisiana Medical Malpractice Act (“the MMA”), La. R.S. 40:1299.41 et seq., and of the Nursing Home Residents’ Bill of Rights, La. R.S. 40:2010.8 et seq. (the |/‘NHRBR”).[4] A medical review panel unanimously ruled that the evidence did not support the conclusion that MOI failed to meet the applicable standard of care.[5] The reasons given by the panel for this ruling were: 1) MOI met the standard of care with regard to Ms. D’Antoni’s nutrition, skin care and general medical care, both before and after hospice care was ordered, and 2) Ms. D’Antoni’s deterioration and death were a result of her multiple medical illnesses and especially her dementia.
Following a lengthy bench trial on the merits, the trial court rendered judgment, finding no fault on the part of Hospice, and dismissing plaintiffs’ claims against it with prejudice. However, the trial court found that MOI breached the standard of care owed to Ms. D’Antoni prior to her death, and that said breach contributed to her death. Based on this finding, the trial court found MOI liable to plaintiffs for the survival action filed on behalf of Ms. D’An-toni for damages caused to her by MOI prior to her death, and for damages to the plaintiffs for Ms. D’Antoni’s wrongful death. The court awarded $14,931.51 in special damages, $35,000.00 in general damages for the survival action, and $40,000.00 to each of the three plaintiffs for damages caused to them for the wrongful death of Ms. D’Antoni. The judgment further ordered MOI to pay interest on all sums cast in | .judgment from the date of judicial demand and all costs, except for the costs of Hospice, for which the trial court held Hospice responsible.
MOI appealed, arguing that the trial court erred in finding MOI liable to plaintiffs for the wrongful death and survival actions. MOI also argues that if the trial court judgment is upheld, the costs assessed to MOI should be reduced.
The law regarding the burden of proof required of a plaintiff to prevail in a medical malpractice action was set forth by this Court, in Braud v. Woodland Village L.L.C., 2010-0137, pp. 6-7 (La.App. 4 Cir. 12/8/10), 54 So.3d 745, 750-751, writ denied, 2011-0311 (La.4/1/11), 60 So.3d 1254, (wrongful death action against a nursing home), as follows:
In order for a plaintiff to prevail on a medical malpractice claim, the Louisiana Legislature requires a plaintiff to prove, by a preponderance of the evidence, the three elements set forth in La.Rev.Stat. § 9:2794(A), provided below:
(1) The degree of knowledge or skill possessed or the degree of care ordi *1018 narily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use | (¡reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Beaucoudray v. Walsh, 2007-0818, p. 12 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 923. The plaintiff’s burden of proof in a medical malpractice case has been previously set forth by the Louisiana Supreme Court:
“[T]he plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiff’s injuries resulting therefrom.”
Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94) 643 So.2d 1228, 1232; Beaucoudray, supra, 9 So.3d at 923. Allegations against a nursing home for failure to provide adequate medication and medical care fit within the ambit of medical malpractice actions under La. Rev.Stat. § 9:2794 and other relevant Louisiana medical malpractice statutes. Mineo v. Underwriters at Lloyds, London, 2007-0514, p. 6 (La.App. 4 Cir. 10/22/08), 997 So.2d 187, 192.
Medical malpractice claims are subject to the general rules of proof applicable to any negligence action: the plaintiff must prove a standard of care, a breach of the standard, causation, and damages. Whether alleged malpractice constitutes negligence is a question for the jury. Stamps v. Dunham, 2007-0095, p. 4 (La.App. 4 Cir. 9/19/07), 968 So.2d 739, 743. The Louisiana Supreme Court has provided a two-prong test for the reversal of a fact-finder’s determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993), citing Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
|7In his reasons for judgment, the trial court based his holding of MOI’s liability to plaintiffs on three factual findings:
1) MOI failed to adequately keep Ms. D’Antoni hydrated;
2) MOI failed to ensure that Ms. D’An-toni’s family properly understood the role of hospice care; and
3) MOI failed to notify Ms. D’Antoni’s family of a significant change in her condition on March 23, 2003, when she became very lethargic and was pocketing food in her mouth.
The trial court did not clarify in his reasons whether he based his findings of MOI’s liability only on violations of the MMA or if certain actions or inactions of *1019 MOI resulted in liability under negligence law and/or the NHRBR.
Of the trial court’s three factual findings upon which he based his conclusion that MOI was liable to the plaintiffs, the findings addressing issues of hydration and failure to ensure that Ms. D’Antoni’s family properly understood the role of hospice care (informed consent) are related to medical treatment, and therefore covered under the MMA. In Richard v. Louisiana Extended Care Centers, Inc., 2002-0978, p. 13 (La.1/14/03), 835 So.2d 460, 468-469, the Louisiana Supreme Court stated:
As we have previously held in Coleman v. Deno, 01-1517 (La.1/25/02), 813 So.2d 303, 315-316, to be covered under the MMA, the negligent act must be related to medical treatment. In Coleman, we set forth a six-part test to determine whether a negligent act by a health care provider is covered under the MMA:
(1)whether the particular wrong is “treatment related” or caused by a dereliction of professional skill; (2) whether the wrong requires expert medical evidence to determine whether the appropriate | ^standard of care was breached; (3) whether the pertinent act or omission involved assessment of the patient’s condition; (4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform; (5) whether the injury would have occurred if the patient had not sought treatment; and (6) whether the tort alleged was intentional.
Under the six-factor test set forth in Coleman, plaintiffs’ allegation regarding the failure of MOI to keep Ms. D’Antoni hydrated would constitute a negligent act covered under the MMA if properly proven at trial. However, for reasons that follow, we find that the trial court was manifestly erroneous in concluding, based on the evidence presented, that plaintiffs carried their burden of proving that MOI breached the standard of care in failing to keep Ms. D’Antoni properly hydrated.
The trial court stated in his reasons for judgment that the finding that MOI breached the standard of care in failing to keep Ms. D’Antoni properly hydrated was based on the opinion of plaintiffs’ expert, Dr. Karl Steinberg, an expert in the area of geriatric medicine, nursing home and nursing home care, hospice and hospice care, and the care of patients in hospice. No other medical expert witness in this case concurred with Dr. Steinberg’s opinion on this issue. A review of Dr. Stein-berg’s testimony establishes that his opinion that MOI breached the standard of care with regard to Ms. D’Antoni was based on his opinion that the certification of Ms. D’Antoni for hospice care was not appropriate. In Dr. Steinberg’s opinion, Ms. D’Antoni did not have end-stage Alzheimer’s disease when she was certified for hospice care in October 2002, and did not meet the criteria for hospice admission.
bThe record establishes that the procedures for the certification of Ms. D’Antoni for hospice care were properly followed, and that MOI had no role in the certification process. Given those facts, we conclude that Dr. Steinberg’s testimony was flawed because it was based on his disagreement with the two physicians who certified Ms. D’Antoni for hospice care, neither of whom was employed by MOI. His opinion that Ms. D’Antoni should not have been certified for hospice care was immaterial, and should not have been used as a basis for finding MOI liable for breaching the standard of care in its treatment of Ms. D’Antoni.
*1020 Furthermore, Dr. Steinberg acknowledged that his opinion as to whether MOI breached the standard of care would have been different if he believed that Ms. D’Antoni was an appropriate hospice patient. In noting that his opinion differed from defense expert, Dr. Charles Cefalu, regarding the type of treatment that MOI should have provided to Ms. D'Antoni after she was certified for hospice, Dr. Stein-berg testified:
Probably what I need to say is I believe that Dr. Cefalu feels that this patient was an appropriate hospice patient and that everybody was on the same page, and if that had been the case this would have been a different story. In a hospice patient where you’re not really focused on keeping them well-nourished and things like that, people sometimes have a decline like that and then ultimately they die, and it’s sort of the expected outcome. I think that’s sort of a basic disagreement that two reasonable people have in this matter. So, if that were the case, then you could say: Well, they were doing the best they could.
(Emphasis added.)
Considering the above testimony by Dr. Steinberg and the absence of any other testimony by a medical expert opining that MOI breached the standard of 11ftcare in failing the keep Ms. D’Antoni properly hydrated in the days leading to her hospitalization on March 25, 2003, we find that the trial court erred in concluding otherwise.
In addressing the trial court’s finding that there was a lack of understanding by the family as to the role of hospice care, we first note that Linda D’Antoni Hendrix, a daughter of Ms. D’Antoni, signed a Hospice form entitled “Primary Caregiver Consent.” In signing that form, Ms. Hendrix accepted the role of primary caregiver for her mother, and acknowledged the following statement:
I understand Hospice of the Delta’s goal is not to cure the patients [sic] terminal illness, but to reduce symptoms such as pain, nausea and/or vomiting.
The Hospice form entitled “Patient Election Form,” which was also signed by Ms. Hendrix on behalf of her mother, authorized Ms. D’Antoni to begin hospice care on October 28, 2002, and contained the following acknowledgment:
Hospice care is not curative. Hospice of the Delta is responsible for the medical management of my care related to the terminal illness.
On behalf of her mother, Ms. Hendrix also signed a Hospice form entitled “Do Not Resuscitate Request,” which included the following statement:
I understand that I have an incurable disease certified to be a terminal and irreversible condition by my physician.
Ms. Hendrix also signed a form entitled “Bill of Rights/Informed Consent Acknowledgment,” containing the following statement:
I have received and have been explained, copies of the Patient’s Bill of Rights and Informed Consent for Hospice Care which are located in my admission packet.
In her testimony, Ms. Hendrix admitted that a representative of Hospice, Ms. Paulette Higginbotham, explained each document to her before she signed. Ms. InHendrix acknowledged receiving the “family packet” regarding hospice care, but stated that she did not read it or any of the other materials given to her by Hospice. She testified that she told Ms. Higginbotham that her mother was not dying.
We find error in the trial court’s apparent conclusion that there was a lack of *1021 informed consent in this case. Ms. Hendrix accepted the role as primary caregiver for her mother, and the forms she signed to have her mother certified for hospice care state in very clear language that this type of care does not include attempts to cure the patient’s illness, but rather is focused on reducing symptoms such as pain, nausea and/or vomiting. We find it important to note that Ms. Hendrix worked for the Whitney Bank for thirty-three years, during which time she held positions of responsibility and had experience dealing with documents. During her career at the bank, she worked as a member of conversion teams when the bank bought banks in other states, and as a lending assistant, coding commercial loans for quarterly reports. Given Ms. Hendrix’s level of sophistication in dealing with documents, the wording of the Hospice documents discussed above, and the admission by Ms. Hendrix that an Hospice representative explained the forms to her before she signed, we find that the role of hospice care was clearly explained to her by Hospice. MOI did not breach the standard of care owed to Ms. D’Antoni on the issue of the informed consent of her family regarding the role of hospice care.
MOI next argues that the trial court erred in finding MOI liable to plaintiffs for failing to inform the family of a significant change in Ms. D’Antoni’s condition on March 23, 2003, when a MOI nurse noticed that she was very lethargic and was pocketing food in her mouth. This issue does not fall within the MMA because it was not related to treatment. Rather, plaintiffs’ allegation regarding MOI’s liability for the failure to inform the family of a significant change in condition 112falls under La. R.S. 40:2010.8(A)(22), a section of the NHRBR, which states that a nursing home resident in Louisiana has the “right to have any significant change in his health status immediately reported to him and his legal representative or interested family member, if known and available, as soon as such a change is known to the home’s staff.” We find no error in the trial court’s finding that the changes in Ms. D’Antoni’s condition on March 23, 2003 constituted a “significant change”, and that this triggered a duty on the part of MOI to “immediately” report this change to Ms. D’Antoni’s family. MOI did not do so, and instead waited until the next day when Ms. D’Antoni’s condition further worsened before alerting her family.
As stated above, the plaintiffs’ claim regarding the failure of MOI to notify the family of a significant change in Ms. D’An-toni’s condition on March 23, 2003 is not covered under the MMA because this alleged negligent inaction on the part of MOI was not related to Ms. D’Antoni’s medical treatment as defined under the six-part test enunciated in Coleman v. Deno, supra. However, as noted by the Louisiana Supreme Court in Richard v. Louisiana Extended Care Centers, Inc., supra, p. 10, 835 So.2d at 467, “[t]he NHRBR contemplates matters far beyond the scope of the MMA.” The Court further explained:
Whereas the NHRBR encompasses nearly two dozen rights afforded residents in all nursing homes (not just the qualified ones), the MMA only relates to “malpractice” claims against qualified nursing homes. While there are many claims that a person can assert under the NHRBR that would not fall within the definition of medical malpractice and would, therefore, not be subject to review before a medical review panel, any claim of medical malpractice against a qualified health care provider is encompassed within the ambit of the MMA *1022 and must be reviewed by a medical review panel prior to suit.
| uId., p. 11, 835 So.2d at 467.
In the Richard case, the Court found that the Louisiana Legislature’s enactment of the NHRBR “was not intended to remove malpractice claims against qualified health care providers from the coverage of the MMA, but was instead intended to provide nursing home residents with important rights to preserve their dignity and personal integrity, and to provide a means by which they could enforce these rights.” Id., p. 14, 885 So.2d at 469. Plaintiffs can maintain a MMA claim and a NHRBR claim separately and simultaneously. Henry v. West Monroe Guest House, Inc., 39,442 (La.App. 2 Cir. 3/2/05), 895 So.2d 680, 684.
La. R.S. 40:2010.9, which provides for civil enforcement of any violation of La. R.S. 40:2010.8, was amended on August 15, 2003, to eliminate a claimant’s right to seek monetary damages for violations of La. R.S. 40:2010.8, and instead limited a claimant’s remedies to injunctive relief. However, the violation of La. R.S. 40:2010.8 alleged in plaintiffs’ petition occurred prior to August 15, 2003. Prior to that date, La. R.S. 40:2010.9 stated:
A. Any resident whose rights, as specified in R.S. 40:2010.8, are deprived or infringed upon shall have a cause of action against any nursing home or health care facility responsible for the violation. The action may be brought by the resident or his curator, including a curator ad hoc. The action may be brought in any court of competent jurisdiction to enforce such rights and to recover actual damages for any deprivation or infringement on the rights of a resident. Any plaintiff who prevails in such action shall be entitled to recover reasonable attorney’s fees, costs of the action, and damages, unless the court finds that the losing plaintiff has acted in bad faith with malicious purpose, and that there was an absence of a justiciable issue of either law or fact, in which case, the court shall award the prevailing party his reasonable attorney fees.
B. The remedies provided in this action are in addition to and cumulative with other legal and administrative | uremedies available to a resident and to the Department of Health and Hospitals or other governmental agencies.
Id. (Emphasis added); see also, Randall v. Concordia Nursing Home, 2007-101, p. 7, (La.App. 3 Cir. 8/22/07), 965 So.2d 559, 566.
Although there was no evidence presented to support a conclusion that the failure of MOI to notify Ms. D’Antoni’s family of the significant change in her condition on March 23, 2003 contributed to or caused her death, we find that MOI is liable to plaintiffs for depriving Ms. D’An-toni of her rights under the NHRBR. Ms. D’Antoni had the right to have her family notified of changes in her condition on March 23, 2003, and MOI’s failure to do so was a violation of its obligation under the NHRBR to “preserve [Ms. D’Antoni’s] dignity and personal integrity.” See Richard v. Louisiana Extended Care Centers, Inc., supra, p. 14, 835 So.2d at 469.[6]
*1023 We conclude that the trial court erred in finding that MOI breached the standard of care in its treatment of Ms. D’Antoni, and that this breach contributed to her death. Accordingly, we also conclude that the trial court erred in finding MOI hable to plaintiffs under the MMA for the survival action filed on behalf of Ms. D’Antoni for damages caused to her by MOI prior to her death, and for damages to the plaintiffs for Ms. D’Antoni’s wrongful death. However, because we find that MOI is liable to plaintiffs for depriving Ms. D’Antoni of her rights under the NHRBR, and because MOI’s violation occurred prior to the 2008 amended version of La. R.S. 40:2010.9, plaintiffs are entitled to an award of 11fidamages for this violation. We find that an award of $10,000.00 is appropriate in this case under the NHRBR.[7]
Furthermore, plaintiffs are entitled to recover attorney’s fees for the violation of Ms. D’Antoni’s rights under the NHRBR. As stated above, the version of La. R.S. 40:2010.9, in effect at the time that this violation occurred, stated, in pertinent part, that “[a]ny plaintiff who prevails in such action shall be entitled to recover reasonable attorney’s fees ...” (Emphasis added.) Plaintiffs requested an award of attorney’s fees in their petition, and are entitled to such an award as the prevailing party in its claim against MOI for the violation of Ms. D’Antoni’s rights under the NHRBR. We will remand this matter to the trial court for an evidentiary hearing to determine reasonable attorney’s fees due to plaintiffs from MOI.
Finally, MOI argues that the costs assessed to it by the trial court should be reduced. The trial court ordered MOI to pay costs totaling $14,281.00, which included the following:
1) Expert Fee of Dr. Karl Steinberg— $7,380.00
2) Court Costs — $2,788.62
3) Deposition Costs — $1,273.85
4) Medical Records — $477.71
5) Clarity Litigation — $287.52
6) Transcript Costs — $1,373.30
7) Expert Fee of Dr. Charles Cefalu— $700.00
hfiMOI argues that the trial court should not have ordered MOI to pay deposition costs and the expert fee of Dr. Cefalu, which was the fee for his deposition, because the depositions were not used at trial. MOI cites La. R.S. 13:4533, which states, “[t]he costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.” MOI also argues that the fee assessed for Dr. Steinberg’s services is excessive and contrary to law.
In Watters v. Department of Social Services, 2008-0977, pp. 49-51 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1162, this Court set forth the law regarding taxing of costs, as follows:
A trial court has great discretion in awarding costs (including expert witness fees) and can only be reversed on appeal upon a showing of an abuse of that discretion. Pelleteri v. Caspian Group Inc., 02-2141, p. 19 (La.App. 4 Cir. 7/02/03), 851 So.2d 1230, 1241 (citing *1024 Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans, 01-0486 (La.App. 4 Cir. 9/19/01), 797 So.2d 133); Jacobs v. Loeffelholz, 94-1123 (La.App. 4 Cir. 12/15/94), 647 So.2d 1282, 1287. The governing statutory provisions regulating the recovery of court costs are La. C.C.P. art. 1920, La. R.S. 13:4533, and La. R.S. 13:3666. The Code of Civil Procedure article 1920 provides that “[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.”
“Article 1920 does not mean that there are no guidelines to govern the taxing of costs.” Johnson v. Marshall, 202 So.2d 465, 469 (La.App. 1st Cir.1967). One guideline is that only costs provided for by positive law are taxable against the party east in judgment. Moolekamp v. Rubin, 562 So.2d 1134, 1136 (La.App. 4th Cir.1990) (citing Gore v. American Motorists Ins. Co., 244 So.2d 894 (La.App. 1st Cir.1971)). The jurisprudence has recognized that the types of costs recoverable as court costs are narrowly defined by statute. Tipton v. Campbell, 08-0139, pp. 26-28 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, 44-46. The types of costs that are allowed to be taxed as costs are defined 117in La. R.S. 13:4533 as “the costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court.”
Expert witness fees for testifying at trial and for time spent preparing for that testimony are recoverable. Yuspeh v. Koch, 02-1179, p. 3 (La.App. 5 Cir. 5/28/03), 848 So.2d 96, 98 (citing Smith v. Roussel, 00-1672 (La.App. 1 Cir. 6/22/01), 808 So.2d 726); Orea v. Scallan, 32,622 (La.App. 2 Cir. 1/26/00), 750 So.2d 483, 493-94. The trial court is required to determine the reasonable amount of expert witness fees to be taxed as court costs based on “the value of time employed and the degree of learning or skill required.” La. R.S. 13:3666(A). The amount actually billed by the expert is not determinative of the reasonable amount taxable as costs. Yuspeh, supra (citing Mossy Motors, supra ).
The costs of depositions “used at trial” are recoverable. Boutte v. Nissan Motor Corp., 94-1470 p. 13 (La.App. 3 Cir. 9/13/95); 663 So.2d 154, 162. However, to be considered “used at trial” for purposes of La. R.S. 13:4533, a deposition must be introduced and accepted into evidence. Succession of Franz, 242 La. 875, 883, 139 So.2d 216, 219 (1962). Thus, the costs of depositions that are not used at trial, including the fee of the deponent giving the deposition and the court reporter fees, are not taxable as costs. Moran v. Harris, 93-2227 p. 3 (La.App. 1 Cir. 11/10/94); 645 So.2d 1248, 1250.
After reviewing the transcript of the post-trial hearing regarding costs, we cannot say that the trial court abused his discretion in the assessment of the fee for Dr. Steinberg’s services. However, we do find that the trial court abused his discretion in ordering MOI to pay plaintiffs’ deposition costs in the amount of $1,273.85 and the expert fee of $700.00 for the taking of Dr. Cefalu’s deposition. The depositions were not introduced and accepted into evidence at trial, and therefore, cannot be considered “used at trial” according to this Court’s holding in Watters v. Department of Social Services, supra. Costs for depositions that were hsnot used at trial should not have been assessed to MOI, and will be deducted accordingly.
For the reasons stated above, the trial court judgment in favor of plaintiffs and against MOI is reversed as to the findings *1025 of liability under the MMA for plaintiffs’ wrongful death and survival actions. Judgment is hereby rendered in favor of plaintiffs and against MOI in the amount of $10,000.00 for MOI’s violation of Ms. D’Antoni’s rights under the NHRBR. The amount of costs ordered to be paid by MOI is hereby amended to $12,307.15. This matter is remanded to the trial court for an evidentiary hearing to determine reasonable attorney’s fees due to plaintiffs from MOI. In all other respects, the trial court judgment is affirmed.
REVERSED AND RENDERED IN PART; AMENDED IN PART; AFFIRMED IN PART; REMANDED

. Plaintiffs also filed an appeal in this matter, but their appeal was dismissed as untimely by order of this Court dated February 1, 2012. Accordingly, any arguments by plaintiffs urg-tag modification of the trial court judgment are not properly before this Court. See La. C.C.P. article 2133.

. By order of this Court, the heirs of Deborah D’Antoni Dow were substituted as party plaintiffs due to the fact that Ms. Dow passed away after trial in this matter.

. Dr. Verrette was not named as a defendant in this case.

. Plaintiffs' petition did not reference the statute containing the NHRBR, but did include an allegation that MOI was liable to plaintiffs for "failing to ensure Helen Bergeron D'Anto-ni’s rights were protected, as mandated by state laws and regulations and as provided by the Patient's Bill of Rights.” Under the Louisiana system of fact pleading, the petition sufficiently stated a cause of action under the NHRBR even though the actual statute was not mentioned. See La. C.C.P. article 862; Dubois v. Fab-Con, Inc., 2002-1731 (La.App. 4 Cir. 5/21/03), 848 So.2d 679.

. A hospice provider, such as Hospice of the Delta, is not considered a "health care provider” under the Louisiana Medical Malpractice Act. Therefore, Hospice was not named in plaintiffs’ request for a medical review panel.

. The legislative intent for the adoption of the NHRBR is set forth in La. R.S. 40:2010.6, which reads: "The legislature finds that persons residing within nursing homes are isolated from the community and often lack the means to assert their rights as individual citizens. The legislature further recognizes the need for these persons to live within the least restrictive environment possible in order to retain their individuality and some personal freedom. It is therefore the intent of the legislature to preserve the dignity and personal integrity of residents of nursing homes through the recognition and declaration of *1023 rights safeguarding against encroachments upon nursing home residents’ right to self-determination. ’'

. See Randall v. Concordia Nursing Home, 2007-101, p. 1 (La.App. 3 Cir. 8/22/07), 965 So.2d 559, 562 (where plaintiff's jury award under the NHRBR of "$150,000.00 in damages for the loss of his mother's dignity while she was a resident of the nursing home” was reduced to $100,000.00.)