996 So.2d 27 (2008)
Ollie TIPTON
v.
Dr. Edward CAMPBELL.
Ollie Tipton
v.
State of Louisiana and the Louisiana Patient's Compensation Fund.
Nos. 2008-CA-0139, 2008-CA-0140.
Court of Appeal of Louisiana, Fourth Circuit.
September 24, 2008.
*31 Thomas E. Loehn, Charles K. Chauvin, Boggs, Loehn & Rodrigue, Metairie, LA, for the Louisiana Patient's Compensation Fund.
Terrill W. Boykin, Kriste L. Talton, Kimberly W. Jones, Bordenave Boykin & Ehret, New Orleans, LA, for Ollie Tipton.
James D. "Buddy" Caldwell, Attorney General, J. Elliott Baker, Special Assistant Attorney General, Covington, LA, for State of Louisiana.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge ROLAND L. BELSOME).
PATRICIA RIVET MURRAY, Judge.
This is a medical malpractice case. This suit arises out of an abdominoplasty (tummy tuck) Dr. Edward Campbell performed on Ellie Tipton. Alleging malpractice and failure to obtain an informed consent, Ms. Tipton sued Dr. Campbell. After settling with Dr. Campbell for less than $100,000, Ms. Tipton proceeded to trial against the Louisiana Patient's Compensation Fund ("PCF"). Following a four-day jury trial, Ms. Tipton was awarded damages totaling $1,797,548 ($1,750,000 in general damages, $22,548 in past medical expenses, and $25,000 in future medical expenses). The trial court granted the PCF's post-trial motions and lowered the damage award in two respects: (i) the general damage award was reduced to $400,000 to conform to the statutory limitation of the PCF's liability, and (ii) the future medical expenses award was reduced to $10,000 to conform to the evidence presented at trial. The trial court, however, denied the PCF's motion for new trial. Opposing the PCF's post-trial motions, Ms. Tipton raised the issue of the constitutionality of the $500,000 statutory cap on damages in a medical malpractice action. The State intervened to address this issue and filed a motion for summary judgment, which the PCF adopted. The trial court granted the motion for summary judgment. From these rulings, the PCF and Ms. Tipton appeal. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
On November 26, 2001, Ms. Tipton, then a sixty-five years old Texas resident, first presented to Dr. Campbell, a New Orleans plastic surgeon, seeking an evaluation regarding liposuction. On her first visit, Ms. Tipton informed Dr. Campbell that she was unhappy with the appearance of her abdominal area. She was especially concerned regarding a lump that she had on her left side as a result of a 1963 left nephrectomy (kidney removal).[1] Dr. *32 Campbell recorded that Ms. Tipton had a large, painful vertical scar on her abdomen; that her umbilicus (belly button) was off center to the right; and that she had a hernia through her left nephrectomy incision. Dr. Campbell explained to Ms. Campbell that liposuction would not cure her problem and that an abdominoplasty (tummy tuck) with repositioning of her umbilicus would be the appropriate procedure to address her problem. Before scheduling the procedure, he referred her to Dr. Michael Adinolfi, a thoracic surgeon, for possible reconstruction of her hernia.
On December 10, 2001, Ms. Tipton again presented to Dr. Campbell. In the interim, she saw Dr. Adinolfi, who found that she did not have a hernia; rather, she had a generalized weakness of the left oblique where she had her prior nephrectomy. Dr. Campbell concurred with Dr. Adinolfi's findings and recommended that Ms. Tipton have the following three procedures: (i) abdominoplasty with repositioning of the umbilicus, which involved the removal of excess fat and skin; (ii) removal of the large midline vertical scar beneath her umbilicus; and (iii) imbrication of the oblique musculature to repair the large weakness due to the removal of her left kidney. On this visit, Ms. Tipton agreed to have these procedures. In preparation for the surgery, Dr. Campbell prescribed various medications including a prophylactic antibiotic.
On December 13, 2001, Ms. Tipton returned to Dr. Campbell's outpatient ambulatory surgery center, which was located in the same building as his office, for the procedure. Before the surgery, she signed two consent forms, one for the procedure and one for the anesthesia. Dr. Campbell performed the surgery in an hour and twenty-five minutes, from 8:20 a.m. to 9:45 a.m. According to Dr. Campbell, there were no complications. Shortly after the surgery, Ms. Tipton was discharged to the care of her uncle, Lester Risley.[2]
Dr. Campbell's records reflect that he conducted post-operative examinations of Ms. Tipton on only three occasions: December 20, 2001; December 28, 2001; and January 4, 2002.[3] On December 20, 2001, Dr. Campbell noted that she had no evidence of infection, but she had a contusion *33 to her anterior abdominal wall, which he indicated was not unexpected. On December 28, 2001, he noted she had a little eschar (scab)[4] around the peri-umbilical area, but her wounds were doing fairly well. He prescribed Silvadene cream for her eschar and prophylactic antibiotics. On January 4, 2002, Dr. Campbell found that Ms. Tipton showed no evidence of any infection or other problem except a "minor wound problem" in the peri-umbilical area. Overall, he concluded that she had done extremely well given her age and a very difficult problem. He continued her on the antibiotics and the Silvadene cream for the eschar. On the January 4, 2002 visit, which was the last time that Ms. Tipton saw Dr. Campbell, her stitches were removed.[5]
After seeing Dr. Campbell on January 4, 2002, Ms. Tipton and her uncle, in route to Alabama, stopped at an acute care center in Pascagoula, Mississippi, which was about ten miles from Mr. Risley's home. At that clinic, Ms. Tipton saw Dr. Sidney Pace, an internal medicine doctor. Although Dr. Pace diagnosed Ms. Tipton as having an infection and wound dehiscence,[6] he prescribed the same treatment that Dr. Campbell had prescribed earlier that same dayoral antibiotics, albeit a different type, and Silvadene cream. On January 7, 2002, Ms. Tipton again saw Dr. Pace, who continued the same treatment. Two days later Dr. Pace found that Ms. Tipton's wound was significantly worse. For that reason, he admitted her to the Singing River Hospital, and gave her intravenous antibiotics. Dr. Pace also consulted with two other doctors: Dr. Okechukwu Ekenna, an infectious disease specialist; and Dr. David Miller, a general surgeon. This trio of doctors concurred that Ms. Tipton's wound needed to be debrided. On January 11, 2002, Dr. Miller performed the debridement surgery. On January 16, 2002, Ms. Tipton was released from the hospital.
Because Mr. Risley (Ms. Tipton's uncle) had to return to work out of state, he drove Ms. Tipton back home to Texas where she had other family members. In Texas, Ms. Tipton received assistance in caring for her wound from home health care providers. Also, she saw her regular doctor, Dr. Kenneth Long, who referred her to a plastic surgeon in San Antonio, Texas, Dr. Annette Occhilalini. On January 23, 2002, Ms. Tipton first saw Dr. Occhilalini, who found that Ms. Tipton had suffered a "known complication" from abdominoplasty with partial loss of the abdominal skin.
On April 2, 2002, Ms. Tipton filed a request for a medical review panel ("MRP"). In her request, she alleged that Dr. Campbell's treatment of her breached the applicable standard of care for a plastic surgeon in the following non-exclusive respects:
 Failing to obtain informed consent;
 Failing to keep her adequately informed of her condition and treatment options;
 Failing to properly perform the abdominal surgery;

*34  Failing to provide proper follow-up care, including releasing her from post-operative care prematurely;
 Failing to properly treat her surgical wounds;
 Allowing her surgical wounds to become grossly infected; and
 Failing to adhere to the standard of care of physicians in general and/or within his field of specialization.
On October 7, 2003, the MRP rendered an opinion in favor of Dr. Campbell. The MRP concluded that the evidence did not support the conclusion that Dr. Campbell failed to meet the applicable standard of care. In its written reasons, the MRP stated:
She developed a post operative wound infection and known post operative complication. The patient signed a consent form. Dr. Campbell saw her post operatively. He thought there could be a problem with the wound and placed her on antibiotics and local wound care. Then the patient sought follow-up treatment elsewhere. Dr. Campbell then lost contact with the patient.
On October 22, 2003, Ms. Tipton filed a petition for damages against Dr. Campbell, and his medical corporation, Gulf Coast Plastic Surgery, Inc. In her petition, Ms. Tipton repeated the allegations set forth in her MRP complaint (summarized above) regarding the manner in which Dr. Campbell's treatment of her breached the applicable standard of care for a plastic surgeon and added the following two allegations:
 Failing to conduct post-operative examinations on the patient himself; and
 Failing to examine her post-operative wounds.
On March 30, 2005, Ms. Tipton entered into a settlement agreement with Dr. Campbell, Gulf Coast, and their insurer for $70,000. In the settlement agreement, Ms. Tipton reserved her right to proceed against Dr. Campbell as a nominal defendant. Ms. Tipton then filed a petition for approval of the partial settlement agreement and a demand for payment of additional damages from the PCF.[7]
This matter was tried before a jury from July 16th to 19th, 2007. At trial, Ms. Tipton called the following witnesses: (i) herself; (ii) Dr. Ersek, an expert in plastic surgery from Austin, Texas; (iii) Norma Mahler, Dr. Campbell's former office assistant; and (iv) Mona Ehlar, Ms. Tipton's daughter. She also introduced at trial deposition testimony from: (i) the three doctors who treated her in Picayune, MississippiDr. Pace, Dr. Ekenna, and Dr. Miller; (ii) Dr. Abby Gupta, a plastic surgeon; (iii) Dr. Nicholas Persich, a gastroentrologist; and (iv) Mr. Risley, her uncle who died before trial. Ms. Tipton also introduced photographs and a video of her incision that Mr. Risley took after the operation, and, over the PCF's objection, she was allowed to display her scarred and disfigured abdomen to the jury. The PCF called two witnesses: (i) Dr. John Church, an expert in plastic reconstructive surgery; and (ii) Dr. Brobson Lutz, an expert in the field of infectious disease. The PCF also introduced the deposition testimony of Dr. Campbell, which was read into the record at trial. Other documentary evidence was also introduced at trial.
The jury found in favor of Ms. Tipton. Answering the jury interrogatives, the jury found as follows:
 Dr. Campbell failed to provide informed consent to Ms. Tipton as to the *35 procedures being performed and/or the material risks of the procedures which were being performed by him and that the lack of informed consent was a cause of Ms. Tipton's damages in this case.
 Dr. Campbell's breach of the standard of care was a proximate cause of Ms. Tipton sustaining damages.
 Ms. Tipton was not a fault in connection with causing or making worse any of her damages.
 Ms. Tipton was in need of future medical care.
The jury allocated 100% of the fault to Dr. Campbell, and itemized Ms. Tipton's damages as follows:

Past physical pain and suffering $500,000
Future physical pain and suffering 500,000
Past mental pain and anguish 200,000
Future mental pain and anguish 100,000
Loss of enjoyment of life 200,000
Disfigurement impairment/incapacity 250,000
Past medical expenses 22,548
Future medical expenses 25,000

On August 3, 2007, the trial judge rendered judgment consistent with the jury's verdict and awarded $1,797,548 ($1,750,000 in general damages, $22,548 in special damages for past medical expenses, and $25,000 in future medical expenses). The trial court also awarded legal interest from the date of the filing of the MRP complaint (April 2, 2002).
On July 26, 2007, Ms. Tipton filed a Motion to Tax Costs. On August 9, 2007, the PCF filed a Motion for New Trial/Remititur/Motion to Amend Judgment/Motion to Confirm Judgment With Respect to the Law.[8] In its post-trial motions, the PCF sought a reduction of the verdict in two respects. First, it sought a reduction to conform with the evidence presented at trial on future medical expenses. Second, it sought a reduction to $400,000 of the general damage award to conform to the applicable statutory cap on general damages recoverable from the PCF in a medical malpractice action.
On August 14, 2007, Ms. Tipton filed a motion to strike the PCF's post-trial motions. In her motion to strike, Ms. Tipton challenged the constitutionality of the statutory cap on damages. Contemporaneously, Ms. Tipton filed a separate declaratory judgment action asserting the same constitutional challenge. On September 12, 2007, the State of Louisiana intervened in this action to address Ms. Tipton's constitutional challenge.
On September 21, 2007, the trial court granted a Motion to Transfer and Consolidate Ms. Tipton's Petition for Declaratory Judgment with her earlier filed medical malpractice action. The State filed a motion for summary judgment on the issue of the constitutional challenge, which the PCF adopted. At the request of the parties, the trial court bifurcated the hearing on the constitutional challenge from the hearing on the merits of the PCF's post-trial motions. On September 21, 2007, a hearing was held on the PCF's post-trial motions and Ms. Tipton's Motion to Tax Costs. Although the trial court denied the PCF's motion for new trial, it granted the PCF's motion for remititur and reduced the future medical expense award from $25,000 to $10,000 to conform to the evidence presented at trial. The trial court also granted the PCF's motion to reduce the general award to $400,000 to conform to the statutory limit on its liability. The trial court granted Ms. Tipton's Motion to Tax Costs and awarded $8,436.75.
On October 26, 2007, a hearing was held on the State's motion for summary judgment. *36 Granting the motion, the trial court dismissed Ms. Tipton's declaratory judgment action and the allegations of unconstitutionality of the cap in her motion to strike the PCF's post-trial motion. On November 27, 2007, the trial court certified its judgment on the constitutional challenge as final for purposes of appeal. The PCF appeals the trial court's judgment denying its motion for new trial. Ms. Tipton appeals the trial court's judgment granting the State's motion for summary judgment. Both Ms. Tipton and the PCF appeal the trial court's judgment taxing costs.

ANALYSIS
For purposes of our analysis, we have divided the issues the PCF and Ms. Tipton raise in their appeals into six categories: (i) informed consent, (ii) comparative fault, (iii) best evidence issue, (iv) breach of the standard of care, (v) court costs award, and (vi) constitutional challenge. We separately address each category.

(i) informed consent
The law of informed consent in Louisiana is both statutory and jurisprudential. The governing statute is La. R.S. 40:1299.40, which defines a written consent as "a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures." La. R.S. 40:1299.40(A). The statute further provides that such written consent is presumed valid and effective absent proof that it was induced by misrepresentation of material facts. Id. The statute further provides that "no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent." La. R.S. 40:1299.40(B).
In Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1989)(on reh'g), the Louisiana Supreme Court held that the Legislature did not intend for the statute to supplant the jurisprudential cause of action for informed consent. The court reasoned that "[s]ince the statute does not expressly define or redefine the cause of action for failure to obtain informed consent, such an intention should not be read into its provisions. Its aim is simply to affect the burden borne by the plaintiff who would controvert the disclosure or consent set forth in the consent form." Hondroulis, 553 So.2d at 418. The court further reasoned that the categories of damages listed in the statute "serve to mark the limits of the legislated law and were not intended to deprive patients of the concrete case-specific material information that is essential to an informed and intelligent decision as to proposed treatment." Hondroulis, 553 So.2d at 419. The court still further reasoned that the statutory requirement that a doctor list material risks in general terms "does not permit him to `generalize' in the sense of making vague or indefinite statements that do not understandably communicate the specific material risks to the patient." Hondroulis, 553 So.2d at 422. Accordingly, "[a] non-case specific boiler plate form is not sufficient to qualify for the [statutory] presumption of consent," and "no presumption of consent [arises] where the consent form makes no mention of the risk at issue." Descant v. Administrators of Tulane Educational Fund, 95-2127 p. 24 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 632.
*37 The jurisprudence has enunciated the following four-pronged test that a plaintiff asserting an informed consent claim must satisfy:
1. The existence of a material risk unknown to the patient;
2. A failure to disclose a risk on the part of the physician;
3. That the disclosure of the risk would have led a reasonable patient in the patient's position to reject the medical procedure or choose another course of treatment; and
4. Injury.
Brandt v. Engle, 00-3416, p. 7, n. 1 (La.6/29/01), 791 So.2d 614, 618 (collecting cases). The determination of materiality is a two-step process. Defining the existence and nature of the risk and the likelihood of its occurrence is the first step. Expert testimony generally is required to establish the first step because in most cases an expert is needed to define the risk and the likelihood of its occurrence. The required medical facts necessary to satisfy the first step, however, may be established through the defendant's own admissions and concessions. 1 Steven Pegalis, American Law of Medical Malpractice 3d, § 4:1 (2005).
The second step of the materiality test is for the fact finder (the jury in this case) to determine if the probability of that type harm is a risk that a reasonable patient would consider in deciding on treatment. Stated otherwise, the question is whether a reasonable person in the patient's position probably would attach significance to the specific risk. The second step does not require expert testimony. Brandt, supra.
There are two aspects to proving causation as a result of a lack of informed consent. First, the plaintiff must prove the defendant's breach of duty was a cause in fact of the claimed damages or that the defendant's proper performance of the duty would have prevented the damages. Second, the plaintiff must prove that a reasonable patient in the plaintiff's position would not have consented to the surgery if the material information and risks had been disclosed. Hondroulis, 553 So.2d at 412. "An appellate court, in reviewing a jury's determination that a doctor failed to obtain the patient's informed consent, should focus on the duty of the doctor to provide material information to the patient under the circumstances of the particular case." Lugenbuhl v. Dowling, 96-1575, p. 11 (La.10/10/97), 701 So.2d 447, 453.
As noted, Ms. Tipton signed an informed consent for the abdominoplasty procedure. In the form, the procedure is specified as: "abdominoplasty with reposition of umbilicus. Repair weakness left side. Possible use of mesh to reinforce repair." The material risks of the procedure are enumerated as follows: "infection, scarring, loss of feeling, loss of umbilicus, hematoma, bleeding, elevation of hairline, asymmetry of umbilicus, pulmonary embolus, deep vein thrombosis, death." The form also includes the following provision:
"I acknowledge that I have had the opportunity to ask any questions about the contemplated medical procedure or surgical procedure described ... in this consent form, including risks and alternatives; and acknowledge that my questions have been satisfactorily answered."
The PCF contends that the written form Ms. Tipton signed satisfied the statutory requirements of La. R.S. 40:1299.40 because it set forth the nature of the procedure and explained the risks in general terms. The PCF thus contends that the statutory presumption applies, that the jury erred in ignoring that presumption, and that the jury thus erred in finding Dr. Campbell failed to obtain informed consent. *38 In the alternative, the PCF contends that Ms. Tipton failed to present any expert evidence to establish her informed consent claim. In this regard, the PCF emphasizes that Ms. Tipton's expert, Dr. Ersek, testified that the consent form Ms. Tipton signed met the standard of care. In the further alternative, the PCF contends that Ms. Tipton failed to present any evidence of causation; she failed to present any evidence that a reasonable patient similarly situated to her would not have elected to have the surgery had they been provided with more information regarding the risks involved.
Ms. Tipton counters that the consent form failed to advise her of the material risks of necrosis, dehiscence, constricture, and irritable bowel syndrome.[9] She contends that each of these possible risks occurred. Ms. Tipton cites Dr. Ersek's testimony as establishing the existence and nature of the risks of necrotic tissue, dehiscense, and constricture.[10] She also cites Dr. Ersek's testimony that it would have been appropriate and good practice for Dr. Campbell to advise her of the potential for the development of these risks. She contends that a reasonable patient in her position would have attached significance to these risks in deciding whether to proceed with the procedure.
Although we find Dr. Ersek's testimony alone insufficient to establish any material risks that Dr. Campbell failed to disclose, we find Dr. Campbell's own testimony and operative report sufficient to establish the first step of materiality. In his operative report, Dr. Campbell lists the material risks as including not only those items listed in the written consent form but also wound dehiscense. In his testimony, Dr. Campbell likewise acknowledged the existence of material risks that he failed to discloseincreased risks of wound problems, including wound dehiscene. In his testimony, Dr. Campbell testified that he provided Ms. Tipton with a brochure on the procedure and discussed with her at each visit the potential risks and complications. According to Dr. Campbell, he advised her that she was at an increased risk for wound problems for three reasons: her age (sixty-five years old), her weight (obese), and her prior medical history (multiple prior surgeries). As to the latter point, Dr. Campbell testified that she had a vertical incision on her left flank from her prior nephrectomy (kidney surgery) and that this was a factor that increased her risk because the blood vessels that come down to heal the abdominoplasty (tummy tuck) wound would come off the sides from the intercoastals.[11] Dr. Campbell testified that Ms. Tipton could expect a thirty to forty percent chance of having a wound problem. He further testified that he was not surprised that she did develop such a minor wound problem, which he described as wound dehiscense and a colonized wound. Although he acknowledged that it is standard for his patients to have the surgery at issue as an outpatient, Dr. Campbell testified that he advised Ms. Tipton that she should have the surgery as an inpatient due to her *39 prior nephrectomy (kidney removal) and due to her living out of state.
Although Dr. Campbell testified that he verbally advised Ms. Tipton of all these risks, Ms. Tipton, corroborated by her uncle (Mr. Risley), testified that Dr. Campbell did not discuss these risks with her. Given the conflicting testimony, we cannot say the jury was manifestly erroneous in finding that the increased risk of a wound problem, including wound dehiscense, was a material risk of the surgery that was not disclosed.
We likewise find no error in the jury's finding that there is a causal connection between Dr. Campbell's failure to inform Ms. Tipton and the occurrence of the risk. "[W]hen the risk is greater or the need for surgery lesser, reasonable patients could differ as to whether they would consent to the surgery. In such cases, in which reasonable persons might differ, the failure to inform the patient of a material risk can be the cause of the harm if the risk materializes." Coscino v. Wolfley, 96-702, p. 9 (La.App. 4 Cir. 6/4/97), 696 So.2d 257, 263. Such is the case here. We thus affirm the jury's finding that Dr. Campbell failed to obtain Mr. Tipton's informed consent.

(ii) comparative fault
The issue of whether the jury should be allowed to consider the comparative fault of the Mississippi physicians who treated Ms. Tipton was raised before trial in a motion in limine. The trial court deferred ruling on the issue until the close of the evidence. The trial court then ruled that the jury would not be allowed to consider the comparative fault of the Mississippi physicians. The PCF contends that the trial court's ruling was legally erroneous. In support, the PCF cites La. C.C. art. 2323, which requires the consideration of the fault of all persons regardless of whether they are named as parties, and contends that the Mississippi physicians are "persons" under Article 2323. The gist of the PCF's argument is that if Dr. Campbell was at fault then so was Dr. Pace, who continued to provide the identical treatment as Dr. Campbell for almost a week. The PCF points out that the experts who were asked at trial whether Dr. Pace violated the standard of care by continuing the same treatment as Dr. Campbell opined that Dr. Pace had not violated the standard of care.
We find it unnecessary to reach the legal issue of whether the trial court erred in refusing to allow the jury to consider the fault of the Mississippi physicians. The record does not support a finding that either Dr. Pace or Dr. Campbell was at fault in treating Ms. Tipton's wound after the abdominoplasty operation with Silvadene cream and antibiotics. In this regard, we agree with the PCF that a double standard of care does not apply. Insofar as the other two Mississippi physicians, Dr. Miller and Dr. Ekenna, no expert testimony regarding any fault on their part was introduced at trial. The trial court thus did not err in refusing to allow the jury to consider the fault of the Mississippi physicians.

(iii) best evidence issue
The PCF contends that the trial court legally erred in refusing to allow it to introduce as impeachment evidence a copy of an affidavit of Ms. Mahler, a former disgruntled employee of Dr. Campbell who had her own pending malpractice suit against Dr. Campbell. Ms. Mahler was called as a witness at trial by Ms. Tipton. Ms. Mahler testified that Ms. Tipton complained of problems with her wound postoperatively. She also testified that Dr. Campbell became angry when he found out Ms. Tipton had filed suit and that he *40 instructed her to change Ms. Tipton's records, which she did.
During his cross-examination of Ms. Mahler, counsel for the PCF sought to introduce as impeachment evidence a copy of an affidavit Ms. Mahler allegedly signed on August 5, 2004. Because the PCF did not have the original affidavit, the trial court refused to allow the PCF to introduce the affidavit into evidence. The PCF thus proffered a copy of the affidavit into the record. In the affidavit, Ms. Mahler attested to the following:
 As of December, 2001, she was an employee of Gulf Coast Plastic Surgery. In connection with her duties at Gulf Coast, she did preoperatively speak with Ms. Tipton about her proposed surgery scheduled in December 2001.
 She was not present in the operating room during the surgery of Ms. Tipton. She had no information or knowledge of what occurred during the surgery having not been present for any part of the actual surgery.
 She is not a medical doctor and has no opinions regarding the indications for or the actual performance of the surgery performed by Dr. Campbell on Ms. Tipton.
 Although she may have seen Ms. Tipton in the office after her surgery, for post-operative visits, she has no opinions, knowledge or recollection of Ms. Tipton having any wound infection or wound problems.
 She, not being a medical doctor, or physician, has no knowledge, recollection or opinions in connection with any of the issues raised by Ms. Tipton in her Petition for damages, and she has not seen the Petition.
 She has no personal knowledge or recollection that Ms. Tipton had a wound infection, wound dehiscence or wound complication and has no opinion regarding the cause of any alleged wound infection, dehiscence or complication.
 She has no knowledge, and is in no position to state, any opinions on any issues pertaining to national statistics on surgical center and/or hospital infection rates for abdominal plastic surgeries or the specific infection rate of abdominal plastic surgeries at Gulf Coast.
The PCF contends that the trial court's evidentiary ruling excluding the affidavit from evidence was erroneous and that it was prejudiced by the trial court's ruling. The PCF argues that the copy of the affidavit was admissible under La. C.E. art. 1003, which provides that "a duplicate is admissible to the same extent as an original," and under La. C.E. art. 1004, which provides that an original is not required if the original has been lost or destroyed or is otherwise not available. The PCF contends that Ms. Tipton's counsel admitted at trial the original affidavit had been produced in prior discovery, but that it may have been lost as a result of Hurricane Katrina.
Ms. Tipton counters that the trial court correctly excluded the affidavit and that even assuming it erred there was no prejudice given the trial court allowed the PCF to question Ms. Mahler from the affidavit at trial.
La. C.E. art. 1003 provides that a duplicate is admissible to the same extent as an original unless: (1) a genuine issue is raised as to the authenticity of the original; (2) under the circumstances it would be unfair to admit the duplicate in lieu of the original; or (3) the original is closely related to a controlling issue, such as a testament offered for probate or a contract on which a claim or defense is based. Article 1003 is not applicable because the authenticity of the original affidavit was *41 questioned by Ms. Tipton's counsel at trial. Ms. Mahler testified that she was unsure if the signature on the affidavit was her signature. She also testified that she did not recall meeting with Dr. Campbell's attorney.
The other provision the PCF cites is La. C.E. art. 1004, which provides:
The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:
(1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;
(2) Original not obtainable. No original can be obtained by any available judicial process or procedure;
(3) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and he does not produce the original at the hearing;
(4) Collateral matters. The writing, recording, or photograph is not closely related to a controlling issue; or
(5) Impracticality of producing original. The original, because of its location, permanent fixture, or otherwise, cannot as a practical matter be produced in court; or the cost or other consideration to be incurred in securing the original is prohibitive and it appears that a copy will serve the evidentiary purpose.
In the instant case, no evidence was presented that the original affidavit was lost or destroyed or that it could not be obtained. Ms. Tipton's counsel represents that he never had possession of the original affidavit; rather, a copy of this affidavit was provided to Ms. Tipton's counsel by Dr. Campbell's counsel in response to a request for production dated October 26, 2004. The original affidavit apparently is in the possession or Dr. Campbell's counsel, who was not a participant at the trial in this matter. Although the PCF suggests that Ms. Tipton's counsel should have filed a motion in limine regarding the affidavit, it was the PCF that sought to introduce the affidavit at trial. The PCF thus should have taken steps before trial to either obtain the original from Dr. Campbell's counsel or obtain a stipulation from Ms. Tipton's counsel regarding the authenticity of the copy. We further note, as Ms. Tipton pointed out, that the trial court negated any prejudice in disallowing the PCF to introduce the affidavit by allowing the PCF's counsel to question Ms. Mahler extensively from the affidavit. Indeed, in so doing the PCF's counsel read almost all of the affidavit to the jury. We still further note that the content of the affidavit primarily addresses Dr. Campbell's post-operative treatment, which (as discussed elsewhere) was not a breach of the standard of care. Under the circumstances of this case, the trial court did not abuse its discretion in excluding the copy of the affidavit.

(iv) breach of the standard of care
In order to establish medical malpractice against a physician, a plaintiff must prove the requisite standard of care, the physician's breach of that standard of care, and that the breach caused the plaintiff's claimed injuries. La. R.S. 9:2794(A); Gibson v. Bossier City General Hosp., 594 So.2d 1332, 1337 (La.App. 2d Cir.1991)(noting that the plaintiff must establish not only a breach of the standard of care, but also a causal relationship between the breach and the resulting injuries). Generally, expert testimony is required to meet the burdens imposed by Section 9:2794. *42 Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228.
The burdens imposed by Section 9:2794 on the plaintiff are factual questions and thus subject to the manifest error standard of review. Descant, 95-2127 at pp. 15-16, 706 So.2d at 628. "In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact." Hubbard v. State, 02-1654, p. 11 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103. When the medical experts express different opinions, the fact-finder's determination is given great deference and should not be reversed on appeal unless there is no reasonable factual basis for it. Id.
Given our finding that Dr. Campbell's post-operative treatment of Ms. Tipton did not violate the standard of care, the question posed is whether the record supports a finding that Dr. Campbell's performance of the operation violated the standard of care. The PCF cites Dr. Ersek's testimony that the operating procedures set forth in Dr. Campbell's operative report were generally in accord with the standard of care as precluding a finding of such a violation. Ms. Tipton counters that Dr. Ersek's testimony, taken as a whole, coupled with other evidence supports a finding that Dr. Campbell breached the standard of care in performing the operation. We agree.
At trial, Dr. Ersek identified several problems with Dr. Campbell's performance of the surgery. The first problem was the length of time in which the surgery was performed. As noted elsewhere, Dr. Campbell performed Ms. Tipton's surgery, which included both an abdonimoplasty and a hernia repair,[12] in one hour and twenty five minutes. Dr. Ersek testified that although it is possible to do the procedure in that length of time, it is not possible to do it safely. He testified that it would have taken him three to four hours to perform the procedure. Although Dr. Ersek did not identify any standard regarding the length of time needed to perform the abdonimoplasty procedure at issue, the following colloquy took place between Ms. Tipton's counsel and Dr. Erseck regarding this issue:
"Q. If you do it too quickly is it likely to produce problems with the wound healing after the surgery?
A. It's not quickest that would cause that.
Q. What is it?
A. Lack of blood supply, too much tension.
Q. But my question is, is part of the reason you're able to ensure an adequate blood supply is you take your time and ensure that is done?
A. Yes.
Q. And if you're in a hurry, quickly, you have you're less likely to ensure proper blood supply?
A. Yes.
Q. Is a patient like Miss Tipton here who has a prior history of all the surgeries, you want to make sure you get that blood supply right.
A. Yes, of course."
Another problem Dr. Ersek identified with regard to Dr. Campbell's performance of the surgery involved his failure to preserve the blood supply. Dr. Ersek testified that "the blood supply to the areas *43 around the navel was compromised, which meant it was not adequate" and that this caused Ms. Tipton to develop necrosis of that area. Dr. Ersek explained that proper blood supply is directly related to infection. Contrasting the manner in which he performs an abdominoplasty procedure with the manner in which Dr. Campbell improperly performed the procedure, Dr. Ersek testified:
"[I] go with my fingers in a glove and separate the tissue from the muscle but leave the nerves and arteries and veins more or less in tact, we can gently lift, just as I'm lifting my coat up here (Indicating) and feel in here but leave them behind because they are spaghetti strings and they will stretch a whole lot. Now if somebody is in a big hurry they just might go in there willy nilly just and slash and burn and cut all that, put it down real quick. But I prefer to go in slowly and separate all those tissues carefully preserving as much as we can of the blood supply because when this piece comes down here it's only blood supply is from the skin we separated this whole section from the muscle, so that the skin the dermaplexis is the only source of blood supply that comes way down to the pubis and if we cut all those vessels off it's a long way to percolate down little tiny capillaries, whereas if we leave some of those in tack we get a much better blood supply and a safer incision down at the bottom. Then I would trim that off and what Campbell says he disected up to the ribs, that's all the way up to here and the xiphoid [(the top area between the two ribs)], that's all the way there. Well, that's what I do with my finger so even though I could touch the ribs underneath I still would have many of these spaghetti strings in tack whereas if you just went slash and burn, slash and burn up to the rib you lose all of that, and pulling it down I believe that is part of what happened in this case."
On cross-examination, Dr. Ersek testified that he could testify with a degree of medical accuracy that there certainly were complications in connection with Ms. Tipton's blood supply in connection with the surgery.
Further support for a finding that Dr. Campbell breached the standard of care in performing the surgery is provided by the testimony of Dr. Church. Although Dr. Church was a member of the MRP and reaffirmed his opinion that Dr. Campbell did not breach the standard of care, he testified that an hour and twenty-five minutes would be a "quick time" to perform the procedure in question. He also testified that he would not attempt to perform an abdominoplasty procedure in forty-five minutesthe time that Dr. Campbell testified he routinely performs the procedure because he would be concerned about making mistakes. Dr. Church testified that the reason Ms. Tipton's incision formed an eschar was due to lack of blood supply and too much tension.
Given the above testimony, we cannot find that the jury was manifestly erroneous in concluding that Dr. Campbell breached the standard of care.
The PCF's alternative argument is that even if a breach of the standard of care is shown, the jury committed manifest error in finding that any alleged breach of the standard of care by Dr. Campbell was a proximate cause of Ms. Tipton's alleged damages. In this regard, the PCF points out that Ms. Tipton alleges that as a result of the surgery she suffered massive infection, residual deformity and pain to her abdominal region, and irritable bowel syndrome ("IBS"). The PCF contends that Ms. Tipton never had an infection. It notes that Ms. Tipton never had a fever, *44 her white blood count was normal, and her wound did not have a bad odor. It also cites the testimony of Dr. Lutz that Ms. Tipton did not have an infection, rather she had a classic case of impaired wound healing. Dr. Campbell likewise testified that Ms. Tipton never had an infection.
Contrary to the PCF's contention, the record contains ample evidence that Ms. Tipton developed an infection. On January 4, 2002, Dr. Pace diagnosed Ms. Tipton as having an infection. Likewise, Dr. Ekenna found that she had an infection. Although Dr. Occhialini indicated in her report dated January 23, 2002, that Ms. Tipton did not appear to have any acute infection at that point in time, she provided the following history of Ms. Tipton's present illness ("HPI") since the tummy tuck surgery:
She subsequently developed a significant amount of cellulites and wound infection of her abdominal wound as well as some necrosis of the upper abdominal skin flap requiring a repeat trip to the operating room on January 11th, 2002 for debridement of her abdominal skin. She was hospitalized from the 9th of January through the 15th of January for this abdominal wound infection. She grew Pseudomonas and Staph Warnii from her wound. She was discharged on the 15th of January.[13]
The medical records from the Singing River Hospital likewise document that Ms. Tipton had an abdominal wound infection.
Insofar as the IBS, Ms. Tipton testified at trial that she had bouts of IBS once of twice a year before the abdominoplasty and that since the surgery she has IBS continuously. The PCF contends that there was no proof that the abdominoplasty caused an aggravation of her IBS. In support, the PCF cites the expert testimony questioning whether an abdominoplasty can cause IBS. The PCF also cites the testimony of Dr. Persich, the gastroenterologist who saw Ms. Tipton on one occasion, that Ms. Tipton's prior surgeries could be the cause of her IBS. Dr. Persich, however, also testified that the complications and scarring Ms. Tipton experienced following the abdominoplasty exacerbated her pre-existing IBS. Given Dr. Persich was the only gastroenterologist called to testify at trial, his testimony on this point is undisputed.
At trial, Dr. Ersek expressly related Ms. Tipton's current complaints of pain at the incision site and deformity of the incision site to Dr. Campbell's breach of the standard of care. As noted elsewhere, Ms. Tipton was allowed to display her scarred and disfigured abdomen to the jury at trial. Given the evidence presented, we cannot conclude that the jury was manifestly erroneous in finding of a breach of the standard of care and causation.

(v) court costs award
The Code of Civil Procedure provides that "[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La. C.C.P. art. 1920. Costs are defined as "the cost of the clerk, sheriff, witness fees, costs of taking depositions, and copies of acts used on the trial, and all other costs allowed by the court." La. R.S. 13:4533. The trial court is required to determine the amount of expert witness fees to be taxed as court costs based on "the value of time employed and the degree of learning *45 or skill required." La. R.S. 13:3666(A). The assessment of costs, including expert witness fees, lies within the trial court's discretion and can only be reversed on appeal upon a showing of an abuse of that discretion. See Pelleteri v. Caspian Group Inc., 02-2141, p. 19 (La.App. 4 Cir. 7/02/03), 851 So.2d 1230, 1241 (citing Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans, 01-0486 (La.App. 4 Cir. 9/19/01), 797 So.2d 133); Jacobs v. Loeffelholz, 94-1123 (La.App. 4 Cir. 12/15/94), 647 So.2d 1282, 1287.
Granting Ms. Tipton's motion to tax costs against the PCF, the trial court awarded $8,436.75. In so doing, the trial court itemized the award as follows:
 Reimbursement of costs actually paid to the Clerk of the Civil District Court and the Civil Sheriff of Orleans Parish in connection with this matter in the sums of $1,941.50 and $920.00, respectfully;
 Reimbursement of expert fees as follows: Dr. Persich  $250.00; Dr. Ersek  $750.00; Dr. Pace  $500.00; Dr. Okechukwu  $526.66; and Dr. Miller  $500.00;
 Reimbursement of deposition costs paid to court reporters for: Dr. Persich  $115.75; Mr. Risley  $115.00; and Dr. Miller  $286.02;
 Reimbursement of expenses to obtain medical records $501.16; and
 Reimbursement of copy expenses for trial of $2,030.66.
As noted, both the PCF and Ms. Tipton challenge the award of court costs. The PCF contends that the award should be reduced for two reasons. First, it contends that the award improperly includes court costs and sheriff fees ($1,941.50 and $920.00, respectfully) relating back to the commencement of the case, which includes a two-year period in which it was not a party. Although the PCF argues that it should not be cast with costs for the time before it became a party, it cites no authority precluding such an award. Since these costs were necessary to bring this case to trial, we cannot say that the trial court abused its discretion in its award of such costs.
The PCF's second argument is that the award of $2,030.66 for copy expenses for trial was excessive. It contends that any copy costs that are duplicative in nature and were not incurred for documents introduced at trial are improper. In support, it cites Succession of Franz, 242 La. 875, 139 So.2d 216 (1962), in which the court construed the requirement that the documents be used at trial to mean the introduction and acceptance into evidence at trial. The PCF contends that Ms. Tipton made no showing that the copy costs of $2,030.66 awarded was entirely for documents introduced into evidence at trial. Ms. Tipton counters that the trial court awarded only $2,030.66 of the $4,275.70 in copy costs she sought to recover and that this award was specifically for copies of documents used at trial. She also cites the jurisprudence holding that the trial court has discretion to assess costs based on a plaintiff's summary of the amount spent on copying without independent proof thereof. Saden v. Kirby, 01-2253, p. 7 (La.App. 4 Cir. 8/7/02), 826 So.2d 558, 563 (citing Delaney v. Whitney Nat. Bank, 96-2144 (La. App. 4 Cir. 11/12/97), 703 So.2d 709)). Given the circumstances presented in this case, we cannot say the trial court's award for copy expenses for trial was an abuse of discretion.
On appeal, Ms. Tipton argues that the cost awarded were inadequate in one respect: the award of only $750 in expert witness fees for Dr. Ersek's testimony at trial. In her motion to tax costs, Ms. Tipton sought to recover the $10,000 expert *46 witness fee that Dr. Ersek charged for testifying at trial (his fee was $5,000 a day). She argues that the trial court failed to consider the usefulness of Dr. Ersek's testimony in establishing her malpractice claim, his expertise, and the time that he spent away from his office preparing for and testifying at the trial. The PCF counters that Dr. Ersek has a questionable record and cites as illustrative the fact that he was sanctioned for performing liposuction on himself in front of television news crews. The PCF also points out that Dr. Ersek's testimony regarding a dual standard of care applicable to Dr. Pace and Dr. Campbell for the same treatment was questionable.
A trial court is not required to award as expert witness fees the amount charged by the expert. City of Shreveport v. Noel Estate, Inc., 41,148, pp. 30-31 (La. App. 2 Cir. 9/27/06), 941 So.2d 66, 85-86. The factors the jurisprudence has considered in setting an expert witness fee include: (a) the time spent testifying, (b) the time spent in preparing for trial, (c) the time spent away from regular duties while waiting to testify, (d) the extent and nature of the work performed, (e) the expert's knowledge and attainments, and (f) the helpfulness of the expert's report and testimony. Id. In this case, the trial court set the award for Dr. Ersek at $750. We cannot say the trial court abused its discretion in the amount of this award.
In sum, we conclude that the trial court's award of expert witness fees and costs was within its discretion and was not in error.

(vi) constitutional challenge
Ms. Tipton contends that the trial court erred in granting the State's motion for summary judgment. She contends that there are genuine issues of material fact as to whether the constitutionality of the $500,000 cap set forth in La. R.S. 40:1299.42(B)(1) can be challenged in this case. Appellate courts review grants of summary judgment de novo using the same standard applied by the trial court in deciding the motion for summary judgment. Schmidt v. Chevez, 00-2456, p. 4 (La.App. 4 Cir. 1/10/01), 778 So.2d 668, 670. In this case, the trial court granted the State's motion for summary judgment based on its finding that the holding in Williams v. Kushner, 549 So.2d 294 (La. 1989), is dispositive.
In Williams, the plaintiff settled his claim for medical malpractice with the physician for $100,000 and then obtained a judgment for over a million dollars against the PCF. The trial court reduced the judgment against the PCF to $400,000, and the court of appeal affirmed. The plaintiff challenged the constitutionality of the cap on damages in medical malpractice cases. The Louisiana Supreme Court granted the plaintiff's writ application and divided its analysis of the constitutional challenge of the $500,000 medical malpractice cap into two components: (1) the $100,000 limitation of liability of a single qualified health care provider, and (2) the $400,000 limitation of liability of the PCF when, as in this case, there is one health care provider that has settled with the plaintiff. As to the PCF's limitation of liability, the Court found this aspect of the cap was a valid restriction. The Court reasoned that the PCF was in the nature of a state-run insurance company. It further reasoned that the PCF had no liability whatsoever beyond the statute by which it was created and that "[t]his affirmative act [of the Legislature] is not subject to the Sibley v. Board of Supervisors of La. State University, 477 So.2d 1094 (La.1985) constitutional analysis." Williams, 549 So.2d at 296. Lastly, the Court noted that the PCF "is not a negligent party and does not have *47 the status of an Article 2315 defendant." Id.
As to the $100,000 limitation of liability of the provider, the Court reasoned that the issue was not before it because the plaintiff had settled his claim with the provider before trial. The Court further reasoned that because of the settlement there was no remaining defendant who could be liable for the damages in excess of $500,000. The Court concluded that the question of the constitutionality of the cap on the provider's liability was a moot question. The Court in Williams thus declined to reach the issue of the constitutionality of either component of the cap.
Ms. Tipton argues that the provision in the settlement agreement retaining Dr. Campbell as a nominal defendant preserved her right to challenge the cap and distinguishes this case from the Williams case. The State counters that the only reason for retaining a qualified health care provider as a nominal defendant after a settlement is to allow the plaintiff to make a claim for recovery from the PCF. In support, the State cites jurisprudence recognizing this point. See Crane v. LaRocca, 05-0283, p. 4 (La.App. 4 Cir. 1/18/06), 924 So.2d 1023, 1026 (noting that because the provider settled with the plaintiff, the provider "became a nominal defendant with the PCF stepping into his shoes"); Deano v. Akkuraju, 03-142, p. 1 (La.App. 3 Cir. 10/01/03), 856 So.2d 155, 156 (plaintiffs dismissed their claims against all qualified health care providers and retained one of the named defendants as "a nominal defendant for pursuit of an excess damage claim against the PCF"). The State thus contends that Ms. Tipton's retention of Dr. Campbell as a nominal defendant is a distinction without a difference. We agree. See Bryan A. Garner, Black's Law Dictionary, 1154 (8th ed 2004)(defining a nominal party as "[a] party to an action who has no control over it and no financial interest in its outcome;. . . a party who has some immaterial interest in the subject matter of a lawsuit and who will not be affected by an judgment, but who is nonetheless joined in the lawsuit to avoid procedural defects.")
Williams stands for the proposition that the limitation of the PCF's liability in this case to $400,000 is not subject to constitutional challenge. Given that Dr. Campbell has been fully released from all liability, he may not be cast in judgment. Thus, as in Williams, there is no remaining defendant who can be liable for the damages in excess of $500,000. Ms. Tipton's settlement with Dr. Campbell thus rendered her challenge to the cap moot. Accordingly, the trial court did not err in granting the State's motion for summary judgment and dismissing Ms. Tipton's constitutional challenge.

DECREE
For the foregoing reasons, the judgments of the trial court are affirmed.
AFFIRMED.
NOTES
[1] Ms. Tipton had an extensive prior medical history, which included a tonsillectomy at age eleven, a left nephrectomy (kidney removal) in 1963, an appendectomy and tubal ligation at age nineteen, a partial hysterectomy in 1963, a right shoulder surgery and surgical repair in 1991, a right breast lumpectomy for three nodes in 1991, a gallbladder resection by laparoscopy in 1994, left arm pit nodes removed in 1999, several colonoscopies, and three full term pregnancies. Ms. Tipton also had bouts of irritable bowel syndrome ("IBS") once or twice a year. Despite these health issues, Ms. Tipton, corroborated by her daughter, testified that she was a physically active person and had no chronic pain before the abdominoplasty.
[2] Although Mr. Risley was Ms. Tipton's uncle, they were almost the same age and were raised like brother and sister. Mr. Risley offered to pay for Ms. Tipton to have liposuction as a Christmas gift and to take care of her after the surgery. Because Mr. Risley was living in Grand Bay, Alabama, and taking care of his wife who was in a nursing home there, Ms. Tipton, who was living in Texas, selected a plastic surgeon in the New Orleans area. Mr. Risley went with Ms. Tipton to all of her appointments with Dr. Campbell including the surgery. Ms. Tipton and her uncle spent the night before and after the surgery in a local motel and then returned to Alabama thereafter. He brought her to her post-operative visits in New Orleans thereafter.
[3] Ms. Tipton testified that she saw Dr. Campbell on December 14, 2001; however, Dr. Campbell denied seeing her that day. Ms. Tipton further testified she attended eight post-operative visits, but she was seen by Dr. Campbell only on three of those visits. Ms. Tipton testified that on the other visits she saw other members of Dr. Campbell's staff.
[4] An eschar is a "dry scab, such as one on a burn." P.H. Collin, Dictionary of Medicine (3d ed.2000).
[5] Although Dr. Campbell indicated in his office note for that date that Ms. Tipton was moving to Dallas and that he would set her up to see someone there, Ms. Tipton testified that she was told to return in ten days. Moreover, Dr. Campbell's office sent Ms. Tipton a notice by mail seeking to determine why she had not attended her scheduled appointment.
[6] Wound dehiscence means the "splitting open of a surgical incision." P.H. Collin, Dictionary of Medicine (3d ed.2000).
[7] Because the settlement with Dr. Campbell was for less than $100,000, the PCF was allowed to try the issue of Dr. Campbell's liability. Russo v. Vasquez, 94-2407 (La. 1/17/95), 648 So.2d 879.
[8] For ease of reference, the PCF's motions are referred to collectively as the PCF's post-trial motions.
[9] As noted elsewhere, Ms. Tipton testified that the only risk Dr. Campbell orally advised her about was that she could die when she was put to sleep.
[10] Ms. Tipton described the constricture she experiences as follows: "Feels like I got a rubber band this wide that goes across here (INDICATING) and about 4 big strong men back there pulling on it, then I have it pulls me down from here and pulls me up from here. Constant."
[11] The intercoastals are the muscles between the ribs. P.H. Collin, Dictionary of Medicine (3d ed.2000).
[12] According to Dr. Campbell, Ms. Tipton did not have a true hernia. Rather, she had a generalized weakness of the left oblique, which he repaired during the operation by imbrication of the oblique musculature.
[13] We acknowledge, as the PCF points out, that Dr. Occhialini also indicated in the medical record entry dated February 28, 2002, that she doubted Ms. Tipton's infection was causing pain. We do not read this entry, however, as indicating that there was no infection.